Archie BROWN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18005.

United States Court of Appeals
Ninth Circuit.

June 19, 1964.

Certiorari Granted Nov. 9, 1964.

See 85 S.Ct. 187.

Richard Gladstein, Gladstein, Anderson, Leonard & Sibbett, San Francisco, Cal., for appellant.

J. Walter Yeagley, Asst. Atty. Gen., George B. Searls, Carol Mary Brennan, Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Marshall W. Krause, American Civil Liberties Union of Northern California, San Francisco, Cal., amicus curiæ.

Before CHAMBERS, BARNES, HAMLEY, JERTBERG, MERRILL, KOELSCH, BROWNING and DUNIWAY, Circuit Judges.

MERRILL, Circuit Judge.

This appeal challenges the constitutionality of § 504 of the Labor-Management and Reporting Act (29 U.S.C. § 504) which makes it unlawful for a member of the Communist Party to hold office in a labor union.

The section is set forth in the margin.[1] It will be noted that the criminality is achieved in two stages: First, the holding of such office by a member of the Communist Party is prohibited as a regulation of interstate commerce; second, the violation of this regulatory prohibition is made a crime.

Section 504 was enacted in 1959 as part of the Labor-Management Reporting and Disclosure Act and is the successor of § 9(h) of the Taft-Hartley Act, which was then repealed. The latter section barred the facilities of the National Labor Relations Board to any labor organization the officers of which failed to file with the Board affidavits that they were not members of or affiliated with the Communist Party.

■ There can be little doubt, in the light of the legislative history of § 504, that it was designed to achieve the same Congressional objectives as former § 9 (h) and achieve them more effectively.[2]

The purpose of the former section and the evils Congress intended it to combat were fully explored by the Supreme Court in American Communications Ass'n v. Douds (1950) 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. There the court stated, at pages 388–389, 70 S.Ct. at page 678–679:

> "One such obstruction, which it was the purpose of § 9(h) of the Act to remove, was the so-called 'political strike.' Substantial amounts of evidence were presented to various committees of Congress, including the committees immediately concerned with labor legislation, that Communist leaders of labor unions had in the past and would continue in the future to subordinate legitimate trade union objectives to obstructive strikes when dictated by Party leaders, often in support of the policies of a foreign government. * * *

1. "§ 504. Prohibition against certain persons holding office; violations and penalties

"(a) No person who is or has been a member of the Communist Party or who has been convicted of, or served any part of a prison term resulting from his conviction of, robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, assault which inflicts grievous bodily injury, or a violation of subchapter III or IV of this chapter, or conspiracy to commit any such crimes, shall serve—

"(1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other employee (other than as an employee performing exclusively clerical or custodial duties) of any labor organization, or

* * * * *

during or for five years after the termination of his membership in the Communist Party, or for five years after such conviction or after the end of such imprisonment * * *.

"(b) Any person who willfully violates this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both. * * *"

2. See H.R.Rep. No. 741 on H.R. 8342, 86th Cong., 1st Sess., 33–35, 79 (supplementary views), I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 791, 837. The original bill as it passed the Senate on April 25, 1959, contained no criminal disability provision relating to Communists. See S. 1555, 86th Cong., 1st Sess., § 305 (a) (1959), and S.Rep. No. 187 on S. 1555 at 12–13. The Senate recognized the defects of the affidavit procedure then in use, but sought to make detailed changes with respect to the time for filing, the role of the N.L.R.B. in administrating the procedure, etc., while preserving the affidavit framework for control of Communists in the labor unions. S.Rep. No. 187, supra, 36–37, I Legislative History, supra, 430–432. It was the House bill, H.R. 8342, passed in July of 1959, which first contained a prohibition against Communists holding office in labor unions together with a repeal of 9(h). See §§ 201(3) and 504(a) of H.R. 8342, supra. In conference the House amendment to the Senate bill S. 1555 was agreed to with various substitutions, including an added criminal sanction against any labor organization or official thereof knowingly permitting any person to violate § 504. See Confce.Rep. 1147 on S. 1555, 86th Cong., 1st Sess., 36 (1959), I Legislative History, supra, 940.

"It is sufficient to say that Congress had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives, including the advocacy of change by democratic methods, but to make them a device by which commerce and industry might be disrupted when the dictates of political policy required such action."

Section 504, then, was enacted in a continuing effort by Congress, in its regulation of interstate commerce, effectively to prevent the interruption of a free flow of commerce by political strikes.

Appellant has been a member of the Communist Party since at least 1935. In elections for the years 1959, 1960 and 1961, he was, while a party member, elected a member of the Executive Board of Local 10 (San Francisco, California) of the International Longshoremen's and Warehousemen's Union. Thereafter, while a party member, he served in this official capacity. He was thereupon indicted for a violation of § 504. He was tried and convicted and this appeal is taken from judgment of conviction.

Before we reach the constitutional problems which the appeal presents, it is necessary to deal with a matter of statutory construction. Appellant contends that the executive board of the local to which he was elected is not a "governing body"; that it is not the sort of "executive board" to which the statute applies.

The court instructed the jury that the Union's executive board was an executive board within the meaning of the statute. Appellant assigns as error the action of the district court in taking this question from the jury and in refusing to instruct the jury that it had to find that the board had power to impose its policies upon the Union and thus to engage the Union in activities which might disrupt the flow of commerce.

Two questions are presented by these contentions. First, was a jury question presented as to whether or not the executive board of the Union was an "executive board or similar governing body" within the meaning of the statute? Second, if not—if this question was a question of law—was it correctly answered by the court? Upon both issues we agree with the district court.

As to the nature of the Union's board we find no factual dispute to be resolved. The constitution of Local 10, setting forth the nature and powers of the executive board, was put in evidence and was read to the jury by appellant's counsel.[3] Appellant introduced testimony to show that the executive board was primarily a recommending body whose resolutions were subject to review (and rejection) by the total membership before being translated into action.

We may accept as true all factual contentions asserted by appellant to have been established by this proof; specifically, that the board was without power on its own authority to bring about the evil with which Congress was concerned.

The true issue presented by the contentions of appellant was not as to the authority actually possessed by the Union board, but whether a board having the nature and powers specified by the

3. The Constitution described the executive board as "the advisory board of the Local," and provided that its powers and functions were: "to adopt such measures as are deemed necessary from time to time for the good and welfare of the local, subject to the approval of the membership; * * * attend to all matters referred to it by the local, also suggest remedies for immediate and permanent benefit and report to the regular meeting; * * * dispose of communications not of interest to the local and cooperate in every way so that the business to be covered at a regular meeting may be accomplished; * * * In cases of emergency * * * to act to protect the interests and welfare of the local; * * * study the labor movement closely and formulate concrete policies to strengthen our local —said policies to be in accord with the I.L.W.U."

local's constitution for this board, even though limited in its powers as factually contended by appellant, was an "executive board or similar governing body" within the meaning of the statute. This was a question of law.

Upon that question we note first that under the local's constitution the "executive board" was an integral part of the frame of government set up by that document for the local.

■ In our judgment appellant reads § 504 too narrowly in attempting to confine "executive board" or "governing body" to one which, on its own authority, could take or require action threatening an interruption of commerce. While the statute was designed to strike at such interruptions its concern was not limited to those of executive authority who might by executive order accomplish such interruption. It included as well those who might by their position or office have power to influence such a result.

We note further that by specifying "any executive board" as well as "director" Congress apparently intended to include boards with a scope of authority different from that ordinarily possessed by a corporation's board of directors. By including within the prohibition all employees save those performing exclusively clerical or custodial duties, it has clearly manifested its desire to bring within the purview of § 504 persons other than those who ultimately control the unions.

We also note that this Act and this section apply to persons convicted of certain crimes as well as to Communist Party members. Congress' wish to rid labor unions of racketeering and corruption by driving out criminal elements cannot reasonably be said to be restricted to upper-echelon positions of real power.

We conclude that the district court did not err in instructing the jury as it did.

This brings us to a consideration of the constitutional issue: whether criminal punishment of any and all Communist Party members who become union officers, regardless of lack of intent to bring about the evil the statute was designed to prevent or to further other unlawful aims of the Party, infringes the guarantees of the First and Fifth Amendments.

The district court, in denying motions to dismiss the indictment and for acquittal, held that no proof of specific intent of any kind was necessary under the statute and that so construed the statute was constitutional.[4]

■ We turn first to a consideration of the question whether, as so construed, this regulation constitutes an impermissible restraint upon appellant's First Amendment "freedom of association for the purpose of advancing ideas and airing grievances." Bates v. Little Rock (1960) 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480. In support of the district court judgment the Government relies upon American Communications Ass'n v. Douds, supra. There it was stated, at page 390 of 339 U.S. at 680 of 70 S.Ct.:

"There can be no doubt that Congress may, under its constitutional power to regulate commerce among the several States, attempt to prevent political strikes and other kinds of direct action designed to burden and interrupt the free flow of commerce."

It held that Congress could attempt to prevent Communists from serving as union officers by legislation providing that the important benefits of the National Labor Relations Act, including access to N.L.R.B. facilities, should be denied to unions having any Communist officers.

The Government urges that from this it follows that Congress, in order to make more effective its remedy for the conditions it could thus reasonably have

4. The district court rejected appellant's offer of evidence that he had no intent to bring about any substantive evil, and it refused to give requested instructions requiring a finding of such intent.

found, could also impose personal criminal sanctions on this same general basis of political affiliation, by providing that mere membership in the Communist Party, when combined with union officership, is conclusive of guilt. We cannot agree.

At least grave doubt is cast upon such a contention by the more recent Supreme Court decisions in Scales v. United States (1961) 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782, and Noto v. United States (1961) 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836. The thrust of these decisions was that a criminal conviction for becoming a member of an organization advocating overthrow of the government —in these cases the Communist Party— can escape First Amendment condemnation only if in each case it is proved (1) that the organization was engaged in the type of advocacy, of action to accomplish overthrow, that is unprotected by the First Amendment, and (2) that the defendant was an "active" member of such an organization with a specific intent to further such unlawful purposes. The court's rejection of membership per se as a constitutionally sufficient ground of conviction was based upon the recognition, also voiced in Douds, 339 U.S. at 393, 70 S.Ct. at 681,[5] that the Communist Party has both legal and illegal aims and carries on both legitimate and illegitimate activities, and the further recognition that there may be members "for whom the organization is a vehicle for the advancement of legitimate aims and policies" alone. "If there were a * * * blanket prohibition of association with a group having both legal and illegal aims," the court reasoned, "there would indeed be a real danger that legitimate political expression or association would be impaired," Scales v. United States, supra, 367 U.S. at 229, 81 S.Ct. at 1486, for "one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." Noto v. United States, supra, 367 U.S. at 299–300, 81 S.Ct. at 1522.

In Douds the court, at page 400 of 339 U.S., at page 684 of 70 S.Ct., states the problem posed by that case as follows:

"In essence, the problem is one of weighing the probable effects of the statute upon the free exercise of the right of speech and assembly against the congressional determination that political strikes are evils of conduct which cause substantial harm to interstate commerce and that Communists and others identified by § 9(h) pose continuing threats to that public interest when in positions of union leadership. We must, therefore, undertake the 'delicate and difficult task * * * to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.' Schneider v. State, 1939, 308 U.S. 147, 161 [60 S.Ct. 146, 84 L.Ed. 155]."

In discussing the extent to which the holding in Douds bears upon the present case it is essential that the dimensions of the restraint (both in that case and in ours) be examined.

In one respect the dimensions coincide: how far into the rights involved the restraint cuts.

The court in Douds, at page 402, 70 S.Ct. at page 686, notes:

"The statute does not prevent or punish by criminal sanctions the making of a speech, the affiliation with any organization, or the holding of any belief."

The restraint involved simply a loss of the right to hold union office—what the court refers to as "loss of position."

However, the court makes clear that lack of direct restraint upon Communist

5. 339 U.S. at 393, 70 S.Ct. at 681: "Communists, we may assume, carry on legitimate political activities."

Party membership does not eliminate the First Amendment problem. At page 402, 70 S.Ct. at page 686 the court states:

"But as we have noted, the fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes. A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature."

That loss of position by virtue of Communist Party membership is not to be confused with the usual conflict-of-interest situation is pointed out by the court at pages 392-393, 70 S.Ct. at page 681:

"If no more were involved than possible loss of position, the foregoing would dispose of the case. But the more difficult problem here arises because, in drawing lines on the basis of beliefs and political affiliations, though it may be granted that the proscriptions of the statute bear a reasonable relation to the apprehended evil, congress has undeniably discouraged the lawful exercise of political freedoms as well. * * * By exerting pressures on unions to deny office to Communists and others identified therein, § 9(h) undoubtedly lessens the threat to interstate commerce, but it has the further necessary effect of discouraging the exercise of political rights protected by the First Amendment. Men who hold union offices often have little choice but to renounce Communism or give up their offices. Unions which wish to do so are discouraged from electing Communists to office. To the grave and difficult problem thus presented we must now turn our attention."

In a second dimension—the quality of the restraint—the restraint confronting us is larger than that in Douds. There the court notes, at page 389, 70 S.Ct. at page 679:

"The unions contend that the necessary effect of § 9(h) is to make it impossible for persons who cannot sign the oath to be' officers of labor unions."

This the court denies, stating at page 390, 70 S.Ct. at page 679:

"The statute does' not, however, specifically forbid persons who do not sign the affidavit from holding positions of union leadership nor require their discharge from office. * * * We are, therefore, neither free to treat § 9(h) as if it merely withdraws a privilege gratuitously granted by the Government, nor able to consider it a licensing statute prohibiting those persons who do not sign the affidavit from holding union office. The practicalities of the situation place the proscriptions of § 9(h) somewhere between those two extremes."

The quality of the restraint in Douds was an indirect "discouragement" obtained through pressure applied to the union. In the language of the court, at page 412, 70 S.Ct. at page 691, it was "[t]o encourage unions to displace them [Communist Party members] from positions of great power * * *."

In our case the restraint is imposed directly upon the individual. It is not discouragement. It is one of the "extremes": flat prohibition.

In our judgment, yet a third dimension of the restraint must also be considered: the force with which it is applied. The court in Douds, at page 409, 70 S.Ct. at page 689, states:

"To hold that such an oath is permissible, on the other hand, is to admit that the circumstances· under which one is asked to state his belief and the consequences which flow from his refusal to do so or his disclosure of a particular belief make a

difference. The reason for the difference has been pointed out at some length above. First, the loss of a particular position is not the loss of life or liberty. We have noted that the distinction is one of degree, and it is for this reason that the effect of the statute in proscribing beliefs —like its effect in restraining speech or freedom of association— must be carefully weighed by the courts in determining whether the balance struck by Congress comports with the dictates of the Constitution."

Since it is the effect of a statute in restraining freedom of association with which we are concerned, we can hardly refuse to consider the consequences which are made to flow from a determined assertion of the rights in question in face of the regulation. In Douds the sanction was not a personal one; it was applied to the union, withdrawing from the union its rights to the benefits of the National Labor Relations Act. In our case, the sanction is not only personal, it is criminal. The imposing of a criminal sanction bears on the substantive quality of the restraint and poses new and different problems as to the reasonableness of the regulation. We are squarely faced with the principles enumerated in Scales and Noto.

This case, then, is far different from Douds. The restraint here bears directly upon the person of the one asserting First Amendment rights, and it does so with the duress of criminal sanctions.

It is with the personal and forceful character of the restraint in mind that we approach the question faced in Douds and which faces us here: whether, in the absence of specific intent to accomplish that which Congress seeks to prevent, there is sufficiently close relationship between the regulation and the achievement of the Congressional objective.

In Douds the court, at page 406, 70 S.Ct. at page 688, states:

"It is contended that the principle that statutes touching First Amendment freedoms must be narrowly drawn dictates that a statute aimed at political strikes should make the calling of such strikes unlawful but should not attempt to bring about the removal of union officers, with its attendant effect upon First Amendment rights."

This contention the court rejected, stating that "Congress should not be powerless to remove the threat, not limited to punishing the act." The court then concludes:

"While this statement may be subject to some qualification, it indicates the wide scope of congressional power to keep from the channels of commerce that which would hinder and obstruct such commerce."

In our judgment the regulation here— far broader than the threat it is designed to meet—is unreasonably broad. To relieve Congress from having to wait until it can punish the act, it is given power not simply to remove the threat but to punish it; and with no showing whatsoever that the act in fact is threatened by the person punished.

We conclude that this statute as construed by the district court constitutes an invalid restraint upon the freedom of association protected by the First Amendment.

Since § 504 involves criminal punishment, we are also faced with serious problems of due process under the Fifth Amendment, which were not before the Supreme Court in Douds. The question raised by § 504 is similar to that stated as follows in Scales v. United States, supra, 367 U.S. at 220, 81 S.Ct. at 1481: whether the section "impermissibly imputes guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete personal involvement in criminal conduct."

Upon this question the court in Scales stated at pages 224–225, 81 S.Ct. at page 1484:

"In our jurisprudence guilt is personal, and when the imposition of

punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity (here advocacy of violent overthrow), that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment."

And further, page 226, 81 S.Ct. page 1485:

" * * * the enquiry here must direct itself to an analysis of the relationship between the fact of membership and the underlying substantive illegal conduct, in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability."

And further, page 227, 81 S.Ct. page 1485:

"It must indeed be recognized that a person who merely becomes a member of an illegal organization, by that 'act' alone need be doing nothing more than signifying his assent to its purposes and activities on one hand, and providing, on the other, only the sort of moral encouragement which comes from the knowledge that others believe in what the organization is doing."

In our judgment these constitutional standards of criminal imputability from association to individual are not met unless § 504 could be read as restricted to party members harboring specific intent to use union office to interrupt interstate commerce or actively and purposefully participating in furtherance of illegal party activities aimed at overthrow of the Government.

It is true that in Scales and Noto the court was faced with a statute which attributed to an individual member of an organization, seemingly on the basis of membership alone, criminal conduct in which the organization was found to be engaged.

Here, it is argued, criminality is not based solely on attribution from association; there is an individually and knowingly performed act—that of becoming a union officer—for which punishment is imposed.

We feel that this is not a valid point of distinction. In Scales the defendant might have been said to have knowingly and individually violated the law through his act of association. (He was indicted for being a member of the party with knowledge of its illegal purpose.) But this was not the gist of the crime—of that which society had found offensive. The gist of the offense was the advocacy in which the organization was engaged.

So here, the gist of the offense (and, indeed, the sole basis for federal concern) lies in the anticipated efforts of the individual to use union authority or influence to bring about union action which would interfere with commerce. This, to quote from Scales, supra, is "the underlying substantive illegal conduct." It is the relationship of Communist union officers to this potential disruptive and illegal activity which alone can justify the punishment imposed by § 504. In our judgment that relationship is not sufficiently substantial to justify, under the due process clause, imposition of criminal punishment on the basis of union officership combined with Communist Party membership per se.

We conclude that the relationship between the conduct or status punished and the evil intended here to be prevented is not sufficiently close or substantial to meet the requirements of either the First or Fifth Amendments unless § 504 can be construed as requiring proof either that the defendant has specific intent to use his union office to attempt to disrupt interstate commerce or that he is an active member of the Communist Party with specific intent to promote unlawful party advocacy and action directed toward overthrow of the Government.

We feel it clear that this statute is not susceptible of such a limiting judicial construction.

It is true that in Dennis v. United States (1951) 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, Yates v. United States (1957) 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 and Scales v. United States, supra, criminal statutes, as applied to Communist activity or membership, were construed narrowly to include requirements of intent and unlawfulness of advocacy that were sufficient to remove doubts as to the constitutionality. But in each case ambiguous statutory language made such construction available.[6]

Here we are not faced with ambiguous statutory expression but with a lack of expression. The segregation of guilty from what we have held must be innocent holding of union office is not at all suggested by the statutory language. It is wholly inappropriate to consider whether scienter should be deemed essential, for the very nature of the scienter that is constitutionally necessary is hidden. No Communist Party member could know, from a reading of the statute, whether, of the many party purposes, those which he personally embraces do or do not disqualify him from union office or employment.

Not only then, is the statute overbroad. It is so wholly lacking in notice of the constitutionally essential components of the crime that it cannot be judicially narrowed.

We conclude that § 504 of the Labor-Management and Reporting Act, in its imposition of criminal sanctions upon Communist Party members, must be held to conflict with the First and Fifth Amendments of the United States Constitution, and upon this ground to be void.

Reversed and remanded with instructions that judgment be set aside and the indictment dismissed.

DUNIWAY, Circuit Judge (concurring):

I concur in the opinion of my brother Merrill. However, because I do not think that his opinion sufficiently answers the arguments advanced by my brother Hamley, I feel obligated to state my views as to those arguments.

I think that the question raised by my brother Hamley is not quite the question that this case presents. In my opinion, if a particular executive board, under the constitution or bylaws or other governing instruments of the union, has powers that bring it within the meaning of 29 U.S.C. § 504 ("executive board or similar governing body"), then it makes no difference that, in practice, the executive board does not exercise some of those

---

6. Thus Dennis held that proof of intent to overthrow the Government by force was an essential element of both § 2(a) (1) of the Smith Act (making it unlawful "to knowingly or willfully advocate * * * or teach" forceful overthrow of the Government), and § 2(a) (3) of the Act (making it unlawful "to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage" such overthrow). The opinion of Chief Justice Vinson, for four members of the court, declared that implicit in the very nature of advocacy of and organization for advocacy of overthrow is an intent to bring about that overthrow. 341 U.S. at 499, 71 S.Ct. 857. Scales involved conviction under the Smith Act clause making it unlawful to become or be a member of any such society advocating or teaching overthrow of the Government, "knowing the purposes thereof." The court declared that the reasoning in Dennis "applies equally to the membership clause," and held that the clause requires proof of specific intent to further illegal and constitutionally unprotected party activities directed toward forcible overthrow of the Government. In Yates, Scales and Noto v. United States, supra, the court, by construing the word "advocate," held that the activity which is punishable by the first clause of the section and in which the organization must engage to warrant punishment of its members under the membership clause, is "advocacy 'not of * * * mere abstract doctrine of forcible overthrow, but of action to that end, by the use of language reasonably and ordinarily calculated to incite persons to * * * action' immediately or in the future." Noto v. United States, supra, 367 U.S. at 297, 81 S.Ct. at 1520 quoting from Yates v. United States, supra, 354 U.S. at 316, 77 S. Ct. 1064.

powers. It would still have the right to exercise them. I think that Congress was aiming at membership in a board having such a right. Therefore, the court could properly look to the union constitution, which was the only governing instrument in evidence. I also think that, assuming that the copy of the constitution in evidence is in fact the constitution, and that it is a correct copy, the question as to whether the executive board is one falling within the statute is a pure question of law. It is not transmogrified into a question of fact because the defendant contends that the board does not fall within the statute. If, in a particular case, the government sought to show that a board in fact had and exercised *more* power than the constitution gave it, the question might be different, but it is not before us.

I cannot tell from Judge Hamley's opinion whether he bases his statement that the question is one of fact upon a construction of the union constitution or upon the evidence offered by the union to show that, in practice, the board did not exercise the full powers that the constitution conferred upon it. If his statement refers to a construction of the constitution, then I think that he is plainly wrong. The meaning and effect of such a document has always been considered a question of law. If his statement refers to the union's evidence as to practice, where, as here, the practice is introduced to show that the board exercises less power than it has, my answer is that, as a matter of law, such practice is immaterial; it would have been improper for the jury to base its decision on that evidence, and the trial judge should have excluded it. Its admission is not an error of which Brown can complain, nor, *a fortiori*, is it an error to fail to tell the jury that it should consider that evidence in deciding whether the executive board was such a board as is referred to in the statute. To tell the jury that would have been error.

Here, as Judge Merrill points out, there was no controversy as to the authenticity or accuracy of the copy of the union's constitution that was in evidence. These facts were "admitted" just as fully and effectively as if there had been a formal stipulation about them. So, in my view, the only question left, on this phase of the case, was one of law.

If I am in error in the foregoing analysis, however, I think that the result would be the same. I agree with Judge Merrill that, even if we accept as true all of the factual contentions of appellant as to this issue, the question is still one of law.

The dispensing power of the jury—its power to decide a criminal case for the defendant, against both the law as stated by the judge and the facts as shown by the evidence, is long established. I think that it lies at the heart of the problem that is here presented. But it does not, in my opinion, require a reversal here.

My view is supported by high authority. In Horning v. District of Columbia, 1920, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185, defendant was charged with violation of a District of Columbia law forbidding pawnbroking at interest in excess of 6%. Defendant admitted that he was pawnbroking, but denied that he was doing so within the District. He testified that he warehoused pledges in the District, but granted loans and signed contracts only in Virginia. He maintained an automobile service to transport customers across the bridge to his office. The court charged that, on that state of facts, he was a pawnbroker in the District. Defendant claimed that the court thus effectively decided against his only defense. Mr. Justice Holmes affirmed:

> "This is not a case of the judge's expressing an opinion upon the evidence, as he would have had a right to do * * *. The facts were not in dispute, and what he did was to say so and lay down the law applicable to them. In such a case obviously the function of the jury if they do their duty is little more than formal. The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the

teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found * * *. Perhaps there was a regrettable peremptoriness of tone —but the jury were allowed the technical right, if it can be called so, to decide against the law and the facts —and that is all there was left for them after the defendant and his witnesses took the stand." (254 U.S. pp. 138–139, 41 S.Ct. p. 54.)

This court has come to a similar conclusion in Peterson v. United States, 9 Cir., 1925, 4 F.2d 702. Defendant, charged with illegally possessing and selling whiskey, admitted possessing the liquor under circumstances that he claimed were not illegal. The charge advised the jury that defendant's testimony admitted illegal possession. Affirmed: "In declaring that the possession was unlawful, the court did no more than to state the law applicable to the admitted facts." (p. 702)

Nordgren v. United States, 9 Cir., 1950, 181 F.2d 718, 12 Alaska 671, which is discussed by Judge Hamley, also seems to me to be squarely in point. There is no claim that, in the present case, the court did not do what trial judges invariably do, and what the trial judge did in Nordgren, namely, tell the jury that it was their sole province to determine the facts. The judge did so instruct the jury, not once, but three times. This case does differ from Nordgren in one respect, namely, that here the court was asked to tell the jury that the question of whether the executive board was such a board as the statute refers to was a question of fact for them to decide. The court's reference to the lack of such a request, in Nordgren, is at most, only an alternative ground of decision, and, more realistically, a sort of bolstering afterthought.

See also the decision of Judge Gilbert in May v. United States, 9 Cir., 1907, 157 F. 1, 5–6. I can find no persuasive basis on which to distinguish these cases from the one before us.

In attempting to hew a path between "law" and "fact" it is difficult if not impossible not to lapse into semantics. I suppose no one would argue that it is not the judge's province to interpret a statute for the jury—this is a "question of law," and one on which he is the expert. I do not think that, in doing so, he is required to limit himself to bland abstractions, although that is what most judges usually do. If a judge is to give effective guidance to the jury, he ought to be as specific in his instructions as the facts of the case allow him to be. I do not see why, in interpreting a statute, he may not state that an admitted board falls within the statute's reference to a board. Defendant's argument is, after all, one of legal analysis, and the judge is better able than the jury to evaluate it. And yet, when the judge personalizes his statutory interpretation to apply to defendant's situation when the question to be decided is a necessary increment in the determination of defendant's guilt, Judge Hamley would call it a question of fact. Impliedly he would sacrifice expertise to protect the jury's discretion to decide irrationally.

I do not think that it aids analysis to argue, as does Judge Hamley, that it is error to direct a verdict in a criminal case (which it is) and that therefore an instruction which "takes a fact question away from the jury" is a partial direction and also error. This assumes too much. The vice in directing the verdict is that the jury is deprived of any opportunity to decide the case. Even though the judge does, in a sense, decide some issues through peremptory instructions of "law" the jury still gets the whole case for a final determination of guilt or innocence. When the jury entertains that final question in the privacy of the jury room its freedom is unrestricted. This is the dispensing power, and all must concede that if the decision is for defendant it is unreviewable and uncorrectable. In practice, it is no doubt less likely that the jury will exercise an independent choice on an issue presented to them

as a matter of "law." But this only gets us back to the original problem: How far may the judge go in inducing responsible exercise of the dispensing power without unduly infringing on that power?

Perhaps this question can be narrowed still further. Judge Hamley distinguishes, and seems to approve, cases which involve, not peremptory jury instructions, but only "permissible comment" by the trial judge. But I suggest that the fact that a federal judge is given some latitude of permissible comment is a commitment against the irrational verdict and a not inconsiderable impingement on the jury's discretion. Conceding that a jury might feel less compulsion to follow a judge's considered opinion than his peremptory instruction "as a matter of law," I doubt whether the difference in effect often is or ought to be substantial. Mr. Justice Holmes addressed himself to this point in Horning v. District of Columbia, supra, and clearly was not troubled by it. Nor was this court in Peterson v. United States, supra.

I do not see that the method adopted by the trial judge here, which finds support in decisions of this circuit and the only Supreme Court case that seems in point, constitutes any significant abridgment of the defendant's right to trial by jury. Moreover, I respectfully suggest that the cases upon which Judge Hamley relies do not as strongly support the result that he would reach as his opinion indicates that they do.

Most clearly distinguishable is Sullivan v. United States, 1949, 85 U.S.App. D.C. 409, 178 F.2d 723. Defendant was charged with "forging and uttering a physician's prescription for a narcotic drug" for the purpose of defrauding the United States. He admitted that he forged the prescription and presented it at a drugstore, but denied his intent to obtain a drug. The charge nevertheless told the jury that he had admitted "forging and uttering" within the statutory definition. This was reversed on appeal, because the admitted conduct was not within the statute unless there was intent to obtain narcotics, and that intent was denied. Clearly this case is one in which the trial court either erroneously stated the law, or, as the court seems to have treated it, assumed a fact on which defendant had testified to the contrary.

United States v. Manuszak, 3 Cir., 1956, 234 F.2d 421, is distinguishable on a different ground. The question there was defendant's guilt on a charge of interstate shipment of stolen goods. The government introduced witnesses to prove the theft, interstate movement, and defendant's involvement. The defense was that the accused was not the man, and knew nothing about the events. The court charged that there was no question that a theft had taken place and the only question was whether defendant had been properly identified as a participant. This was held reversible error because the theft was a necessary element, and its existence was for the jury. But it is clear that the appellate court was concerned that all evidence proving the theft was put on by the government. Overwhelming as it was, and uncontested, there was still the question of credibility, and this is always for the trier of fact. Where as in the present case defendant affirmatively accepts and relies on the evidence which establishes an issue in the case, the credibility aspect is absent. Note also that in Manuszak, the question decided by the court was one of "physical fact" not legal significance. The question was: "Did certain acts take place"; not "did these admitted acts amount in law to theft"? The former question is not one which the judge has any special competence to answer by virtue of his legal training and experience; the latter is.

The same analysis, the significance of credibility, may explain United States v. McKenzie, 6 Cir., 1962, 301 F.2d 880, and Roe v. United States, 5 Cir., 1961, 287 F.2d 435. McKenzie presents the same problem as Manuszak; defendant charged with possession of illicit whiskey; government witnesses testify as to the crime, and identify defendant as a

participant; defendant denies his presence and any knowledge of the alleged acts. One must believe the government witnesses to believe anything took place at all, as well as that defendant was a party. In Roe, the charge was sale of securities without registration. The items sold were mineral leases, which defendants claimed were not "investment contracts," and hence not "securities" within the 1933 Act. The Court of Appeals first analyzed the evidence (without indicating which side had produced it) and held, "as a matter of law, the evidence of these transactions, *if credited*, would constitute" the sale of a security. (Emphasis mine) If, as seems likely, the summarized evidence was government evidence, the same credibility problem is present. It must be conceded, however, that the language in both of these cases suggests that the court would have reached the same result if credibility had not been in issue.

Brooks v. United States, 5 Cir., 1957, 240 F.2d 905, is also explainable on the credibility point. The question assumed in the charge was the authority of an official, before whom defendant was alleged to have sworn falsely, to administer oaths. The official testified as to his authority and introduced his commission into evidence. The charge was that as a matter of law he was authorized. This was held to be error because it deprived the jury of the right to test the credibility of the witnesses, and to determine whether they believed the government's evidence beyond a reasonable doubt.

A careful reading of Carothers v. United States, 5 Cir., 1947, 161 F.2d 718, suggests that this case undercuts, rather than supports, Judge Hamley's position. Defendants were charged with violations of OPA maximum price regulations. The trial court's charge assumed the charging of prices above the applicable maximums. As to one defendant, the court reversed, saying that the court below had directed a verdict as to a material fact. But it added that "the evidence as to the March, 1942, maximum price was quite meager and unsatisfactory."

On the other hand, it sustained the jury charge as to two other defendants because "the defendant's schedules and the administrator's order * * * had fixed *as matter of law* the selling price." (Id. at 722).

This leaves only United States v. Raub, 7 Cir., 1949, 177 F.2d 312. In this case both the charge below and the reversing opinion above are so cloudy as to leave me uncertain as to what principle was applied. Defendant was charged with willful evasion of taxes by the filing of a fraudulent return. His defense was an attempted justification of his return as accurate within the revenue statutes, coupled with a denial of fraudulent intent based on his acting on the advice of his attorney. The oral charge, as reproduced in the opinion, was in effect "No doubt he did what he was charged with, you must decide if it was with purpose or intent to evade taxes." The Court of Appeals held that this prejudged the essential issue of "fraud" and was reversible error. If by this the court meant that the judge might not instruct the jury that the return was false under the law, then this ruling is perhaps contra to the trial court's charge in the present case. But the opinion's ambiguous use of the word "fraud", which to me implies intentional wrongdoing, may suggest that the court was primarily concerned with weighting the question of willfulness against defendant. At best, Raub is not a careful or persuasive analysis of the problem.

In short, I think that the trial court's instruction was correct. It was short, sensible, direct, and fully supported by the conceded fact—the union constitution. It had the great virtue of not dealing in vague abstractions. The jury still had the dispensing power, which, as Justice Holmes pointed out, is a "power to bring in a verdict in the teeth of both law and facts." The charge in no way deprived it of that power.

HAMLEY, Circuit Judge (dissenting).

Without reaching the constitutional question I would reverse and remand for

a new trial. I would do so on the ground that the trial court erroneously and prejudicially decided a question of fact which should have been left to the jury, namely, whether the executive board of Local 10, I.L.W.U. is an "executive board" of a labor organization within the meaning of section 504 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 536, 29 U.S.C. § 504. This question of fact was decided by the court adversely to appellant when the court instructed the jury:

> "I instruct you that as a matter of law, the Executive Board of Local 10, ILWU, is an executive board of a labor organization within the purview of the statute."

The trial court should have instructed the jury as to the meaning of the term "executive board," as used in section 504, leaving it to the jury to determine whether the executive board of Local 10 is an executive board in this statutory sense.

In my view, a union executive board within the meaning of section 504 is any internal body of a union which, under the constitution and by-laws of the union as understood and given effect by the members, has the power substantially to influence or affect action by the union threatening an interruption of commerce. Such a definition gives recognition to the underlying purpose of the legislation which, as pointed out by the majority, is "effectively to prevent the interruption of a free flow of commerce by political strikes."

As I read the evidence and consider the reasonable inferences therefrom, I believe it cannot be said that the evidence shows beyond dispute that the executive board of Local 10 had such power. But even if I am mistaken as to this, it is at the very least clear that appellant did not admit that the executive board of Local 10 had this power. This being true, it was improper for the trial court to decide the question as one of law.

Stating my view in the form of a general proposition, it is this: A trial court may not take from the jury in a criminal case and decide adversely to the defendant, an essential question of fact put in issue by a plea of not guilty and not thereafter admitted, even where the prosecution's view of the fact is supported by overwhelming and undisputed evidence.

There is one decision by this court which may be thought to state a view contrary to that expressed above. This is Nordgren v. United States, 9 Cir., 181 F.2d 718, 12 Alaska 671, involving a prosecution for offering and giving a bribe to a person acting for and on behalf of the United States in an official capacity. It was essential to conviction in that case that the person to whom the bribe was offered and given be a person acting for and on behalf of the United States in an official capacity. There was no dispute in the evidence as to this though the defendant did not concede the fact. The trial court instructed that the person was acting in an official capacity. Affirming, this court said (page 721 of 181 F.2d):

> "We think the charge was not error. There was, as already indicated, no controversy as to the facts pertaining to the functions MacKenzie was performing, and the charge did not misdescribe his duties. Moreover appellant did not ask for an instruction submitting to the jury the question whether MacKenzie was performing an official function. The court in the course of its charge repeatedly informed the jury that it was their sole province to determine the facts."

The statement in this quotation that appellant failed to ask for an instruction submitting the question to the jury, suggests that if such an instruction had been requested it would have been held to be error for the court to take the question from the jury. In the case now before us appellant not only took appropriate exception to the instruction given, but specifically requested that the jury be told that this was a question of fact.

The statement in the quotation from Nordgren to the effect that the court repeatedly informed the jury that it was their sole province to determine the facts, suggests that this court may have regarded the questioned instruction as in the nature of a permissible comment on the evidence rather than as a binding determination of fact. If so, Nordgren cannot be regarded as authority for the proposition that a trial judge may take questions of fact from a jury in a criminal case where the evidence is undisputed.

Nevertheless, Nordgren has been construed by some courts as stating such a proposition. See United States v. Lovely, 4 Cir., 319 F.2d 673, 682, note 11; Schwachter v. United States, 6 Cir., 237 F.2d 640, 644.

Among the other circuits, only the Second appears to sanction the determination of questions of fact by the trial court in a criminal case, where the evidence is undisputed. Such a determination was given approval in United States v. Mura, 2 Cir., 191 F.2d 886. This was a prosecution for transporting stolen cars in interstate commerce. The trial court instructed the jury: "The automobiles that the Government believes have been identified all crossed the border between New York and New Jersey * * *." In sustaining this instruction the court stated that the evidence was conclusive, that the jury was not instructed that defendant transported the cars, and that the question of the defendant's guilt was left to the jury "under a perfectly impartial charge." [1]

In the Third, Fifth, Sixth, Seventh and District of Columbia Circuits, involving all of the more recent decisions on the question, such an instruction has been held to constitute reversible error. See United States v. McKenzie, 6 Cir., 301 F.2d 880; [2] Roe v. United States, 5 Cir., 287 F.2d 435; Brooks v. United States, 5 Cir., 240 F.2d 905; United States v. Manuszak, 3 Cir., 234 F.2d 421; Sullivan v. United States, 85 U.S. App.D.C. 409, 178 F.2d 723; United States v. Raub, 7 Cir., 177 F.2d 312; and Carothers v. United States, 5 Cir., 161 F.2d 718. [3]

Some discussion of a few of these cases will reveal the reasoning which has led a majority of the federal appellate courts to disapprove instructions deciding fac-

---

1. There is another Second Circuit case, United States v. Rainone, 2 Cir., 192 F. 2d 860, which might appear to represent a similar holding. There was, however, no formal instruction, but only a remark by the trial judge to the effect that "there was not any question as to whether the automobile was taken from Brooklyn to Stamford." The court of appeals seems to have regarded this as permissible comment, stating that the record revealed nothing indicating that the defendant was adversely affected by the remark.

As pointed out above, our decision in Nordgren v. United States, may also fall in this category. Dusky v. United States, 8 Cir., 271 F.2d 385, rev'd on other grounds, 362 U.S. 402, 80 S.Ct. 788, 4 L. Ed.2d 824, also appears to involve comment on the evidence rather than a categorical instruction resolving an issue of fact.

A contention that a court instruction took a question of fact from the jury will not be entertained in a collateral proceeding under 28 U.S.C. § 2255, at least where the evidence indisputably supports the instruction. See United States v. Lovely, 4 Cir., 319 F.2d 673; United States v. Jonikas, 7 Cir., 197 F.2d 675. And of course the trial court may instruct that a particular fact is undisputed if it was a fact admitted by the defendant during the trial. Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185; Young v. United States, 9 Cir., 286 F.2d 13; Peterson v. United States, 9 Cir., 4 F.2d 702.

2. This decision is to be compared with two earlier Sixth Circuit decisions in one of which (Schwachter v. United States, 6 Cir., 237 F.2d 640), such an instruction was also disapproved, and in the second of which (Malone v. United States, 6 Cir., 238 F.2d 851), such an instruction was upheld.

3. I do not include in this list cases such as Dixon v. United States, 8 Cir., 295 F.2d 396, where the evidence was in dispute. All courts appear to recognize that factual questions in a criminal prosecution cannot be decided by the trial court where the evidence is in conflict.

tual questions as if they were questions of law.

In United States v. McKenzie, the defendant was prosecuted for possessing distilled spirits, the immediate container thereof not having affixed thereto the required internal revenue stamps. The trial court, in effect, instructed the jury that the identification of appellant was the only issue left in the case. Reversing, the Sixth Circuit said (page 882 of 301 F.2d):

"No matter how conclusive the evidence may be in a criminal case on a controverted material fact, the trial judge cannot make the finding or withdraw the issue from the jury."

In Roe v. United States, the defendant was prosecuted for the sale and delivery of securities through the use of the mails without prior registration. The trial court instructed the jury, on undisputed evidence that the documents which the defendant was charged with selling and delivering were investment contracts. Reversing, the Fifth Circuit said (page 440 of 287 F.2d):

"* * * no fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part."

In Brooks v. United States, the defendant was prosecuted for perjury. The trial court instructed the jury that a named special agent of the Internal Revenue Service was, at the time he was alleged to have administered an oath to defendant, authorized to administer oaths. Reversing, the Fifth Circuit said (page 906 of 240 F.2d):

"* * * it [the instruction] deprived the jury of its function of determining whether or not, under the evidence and as exclusive judges of the facts and of the credibility of the witness, they believed beyond a reasonable doubt that Perry was an officer authorized to administer oaths in 1955 and this violated appellants' constitutional right to a trial by jury as guaranteed by the Sixth Amendment."

In United States v. Manuszak, the defendant was prosecuted for theft of goods from an interstate shipment. One of the facts essential to conviction was that a theft of goods had occurred. The evidence was undisputed that there had been such a theft and the trial court so instructed the jury. Reversing, the Third Circuit said (page 424 of 234 F. 2d):

"The presumption of innocence to which appellant was entitled demanded that all factual elements of the government's case be submitted to the jury. It is immaterial that the government's evidence as to the actual theft was uncontradicted. The acceptance of such evidence and the credibility of witnesses is for the jury, even though to the court the only possible reasonable result is the acceptance and belief of the government's evidence. A partial direction of the verdict occurs when the court determines an essential fact, and this denies the appellant trial by jury."

While the Supreme Court appears not to have dealt with the precise question, it has held that "* * * a judge may not direct a verdict of guilty no matter how conclusive the evidence." United Brotherhood of Carpenters & Joiners v. United States, 330 U.S. 395, 408, 67 S.Ct. 775, 782, 91 L.Ed. 973. I agree with the Fifth Circuit's holding in Roe v. United States, and the Third Circuit's holding in United States v. Manuszak, that when a trial court, in a criminal case, decides a factual issue as a matter of law, it is giving a partial direction of the verdict, and that this is forbidden under the rule prohibiting directed verdicts in criminal cases. If a verdict may not be directed on all issues, it may not be directed on any issue, for the issue upon

which direction is given may be, to the jury, the dispositive issue in the case.

If Nordgren v. United States, 9 Cir., 181 F.2d 718, 12 Alaska 671, is deemed to announce a contrary rule, I believe it should be overruled.

CHAMBERS, Circuit Judge (dissenting).

I agree with Judge Merrill insofar as he holds that Brown's executive board was one within the meaning of 29 U.S.C. § 504 and that it was correct for the trial judge to tell the jury so. Therefore, I would disagree with Judge Hamley's dissent that such was a jury question.

But as of now I would hold the statute constitutional. A far different case we would have if the statute proscribed a Communist party member's right to be a member of a union or to get a job.

I cannot agree that Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925; Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782; and Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836, necessarily indicate we should declare § 504 unconstitutional.

I shall not repeat Judge Merrill's excellent summary of the Congressional reasons for adopting § 504.

All through our United States Code we find restrictions on conflicts of interest with criminal penalties therefor, only because experience has shown "a disposition to commit" on the part of executives. See 18 U.S.C. § 281, § 283; 38 U.S.C. § 1764(a); 38 U.S.C. § 1664; 18 U.S.C. § 1909; 12 U.S.C. § 377; 15 U.S.C. § 19; 12 U.S.C. § 1812; 15 U.S.C. § 78(d); 49 U.S.C. § 1321; and 49 U.S.C. § 11. The fact that a high percentage would discharge their duties without favoritism is

to no avail. "Disposition of the class of persons to commit" is enough for the proscription.

Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, holds one cannot be barred from becoming a lawyer merely because one is or has been a member of the Communist party. I would suppose though that an integrated state bar act might permissibly provide that one could not be an officer of that organization if he were a Communist.

One needs a basic right to a job. One doesn't need a right to be a union officer or to be an executive with a possible conflict of interest with his government.

BARNES, Circuit Judge (dissenting).

I concur with Judge Chambers, both in his agreement with Judge Merrill's opinion, and in his dissent therefrom, as well as his dissent with Judge Hamley on the jury question. I believe that the delicate "balance struck by Congress comports with the dictates of the Constitution." The "wide scope of congressional power to keep from the channels of commerce that which would hinder and obstruct such commerce" is not, to me, violative of § 504 here considered.

While a police officer, or a congressional employee, under investigation, has a "right" to invoke the Fifth Amendment —he has no right to hold a particular job thereafter. Appellant herein had a right to be a certain kind of member in the Communist Party, but has no "right" to hold office in labor unions, which office directs the labor union's policy, once Congress has seen fit to refuse him such office holding. The congressional right to protect the full flow of interstate commerce must itself be protected; not at all odds, but when reasonably exercised, as I feel it here was. In this I disagree with the majority.