352 F.3d 382
 HUMANITARIAN LAW PROJECT; Ralph Fertig; Ilankai Thamil Sangam; Tamils of Northern California; Tamil Welfare and Human Rights Committee; Federation of Tamil Sangams of North America; World Tamil Coordinating Committee; Nagalingam Jeyalingam, Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF JUSTICE; United States Department of State; John Ashcroft, Attorney General; Colin L. Powell, Secretary of State, Defendants-Appellees.
Humanitarian Law Project; Ralph Fertig; Ilankai Thamil Sangam; Tamils of Northern California; Tamil Welfare & Human Rights Committee;
Federation of Tamil Sangams of North America; World Tamil Coordinating Committee; Nagalingam Jeyalingam, Plaintiffs-Appellees,
v.
United States Department of Justice; United States Department of State; John Ashcroft, Attorney General; Colin L. Powell, Secretary of State, Defendants-Appellees.
 No. 02-55082.
 No. 02-55083.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 5, 2003 — Pasadena, California.
 Filed December 3, 2003.
 
 David Cole, c/o Georgetown University Law Center, Washington, D.C., Nancy Chang, Center for Constitutional Rights, New York, NY, Paul L. Hoffman, Schonbrun, De Simone, Seplow, Harris & Hoffman, LLP, Venice CA, Carol A. Sobel, Santa Monica, CA, Visuvanathan Rudrakumaran, New York, NY, for plaintiffs-appellants/cross-appellees.
 Douglas N. Letter, U.S. Department of Justice, Washington, D.C., for defendants-appellees/cross-appellants.
 Appeal from the United States District Court for the Central District of California Audrey B. Collins, District Judge, Presiding.
 Before: PREGERSON, THOMAS, and RAWLINSON, Circuit Judges.
 Opinion by Judge Pregerson; Dissent by Judge Rawlinson.
 OPINION
 PREGERSON, Circuit Judge.
 
 
 1
 In 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Two provisions of AEDPA, section 302 and section 303, codified at 8 U.S.C. § 1189 and 18 U.S.C. § 2339B, authorize the Secretary of State ("Secretary") to designate an organization as a "foreign terrorist organization," and make it a crime with a maximum penalty of life in prison for a person to provide "material support or resources" [hereinafter "material support"] to a designated organization, respectively. This case addresses the question whether a criminal prosecution under 18 U.S.C. § 2339B requires the government to prove as an element of the offense that the defendant knew the organization had been designated by the Secretary as a foreign terrorist organization, or at least knew of the organization's unlawful activities leading to its designation.
 
 
 2
 Plaintiffs are legal and social service organizations and two individuals who seek to provide "material support" to the non-violent humanitarian and political activities of Kurdish and Tamil organizations the Secretary designated as "foreign terrorist organizations." Each of the plaintiffs has a history of donating money and services to support the designated organizations' humanitarian work, which assists refugees and ethnic minorities displaced by decades of conflict in securing the basic necessities for human life. Plaintiffs no longer provide such support in fear of criminal sanctions under 18 U.S.C. § 2339B.
 
 
 3
 Except for a recently asserted Fifth Amendment due process claim, this is the second time that the constitutional issues raised by plaintiffs are before us. In 2000, we decided Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir.2000), cert. denied, 532 U.S. 904 (2001) ("Humanitarian Law Project II"). In that case, we affirmed the district court's partial grant and partial denial of the plaintiffs' motion for a preliminary injunction in Humanitarian Law Project v. Reno, 9 F.Supp.2d 1176, 1205 (C.D.Cal.1998) ("Humanitarian Law Project I"). We agreed with the district court that 18 U.S.C. § 2339B did not violate the First Amendment by allegedly imposing guilt by association and restricting symbolic speech. We also rejected, as did the district court, the plaintiffs' argument that the designation process set forth in 8 U.S.C. § 1189 ran afoul of the First and Fifth Amendments by granting the Secretary overbroad discretion to designate organizations as "foreign terrorist organizations." In addition, we affirmed the district court's partial grant of preliminary injunctive relief that restrained the government's enforcement of two terms included in the definition of "material support," found in 18 U.S.C. § 2339A, i.e., "personnel" and "training." On remand, the district court reaffirmed its prior rulings and issued a permanent injunction that restrained the government from enforcing 18 U.S.C. § 2339B against plaintiffs were they to provide material support in the form of "training" and "personnel" to designated organizations. The government appeals and plaintiffs cross-appeal.
 
 
 4
 We hold that Humanitarian Law Project II is the law of the case; therefore, we decline to revisit the plaintiffs' constitutional challenges to 8 U.S.C. § 1189 and 18 U.S.C. § 2339B, that we previously resolved. We will, however, address plaintiffs' recently asserted Fifth Amendment due process challenge on this appeal, and hold that 18 U.S.C. § 2339B, by not requiring proof of personal guilt, raises serious Fifth Amendment due process concerns. But we conclude that there is no need to address those constitutional concerns because we construe 18 U.S.C. § 2339B to require proof that a person charged with violating the statute had knowledge of the organization's designation or knowledge of the unlawful activities that caused it to be so designated. In addition, we reaffirm our decision in Humanitarian Law Project II that the prohibition on providing "training" and "personnel" in § 2339B is impermissibly overbroad, and thus void for vagueness under the First and Fifth Amendments.
 
 
 The Statutory Scheme
 
 
 5
 Following the tragic 1995 bombing of the Murrah Federal Building in Oklahoma City, President Clinton on April 29, 1996 signed into law the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). At issue in this appeal is the constitutionality of sections 302 and 303 of AEDPA, codified at 8 U.S.C. § 1189 and 18 U.S.C. § 2339B. Section 1189 empowers the Secretary to designate an organization as a "foreign terrorist organization" ("designated organization"). Section 2339B(a) makes it a crime for anyone to provide "material support" and resources to a designated organization.
 
 
 6
 Section 1189 grants the Secretary unique powers to designate an organization as a foreign terrorist organization. Under 8 U.S.C. § 1189(a)(1), the Secretary of State can designate an organization as a "foreign terrorist organization ... if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity ...; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1).[1] At no time during the designation process is the Secretary required to notify an organization that it is being considered for designation as a foreign terrorist organization. Nor does the statute require the Secretary to afford an organization the opportunity to submit or review evidence on its behalf during the designation process.[2] Instead, the Secretary independently compiles an "administrative record" in which "findings" are made as to whether an organization is to be designated as a foreign terrorist organization under § 1189(a)(1). 8 U.S.C. § 1189(a)(2)(A)(i), (3)(A). The Secretary is authorized to base the designation on "classified information," which is unavailable for review by the designated organization.[3] 8 U.S.C. § 1189(a)(3)(B).
 
 
 7
 Seven days before the Secretary intends to designate an organization as a foreign terrorist organization he or she must notify by "classified communication" key Congressional leaders and committee members. 8 U.S.C. § 1189(a)(2)(A)(i). The Secretary must then publish the designation in the Federal Register. 8 U.S.C. § 1189(a)(2)(A)(ii). The Secretary is not obligated under the statute to notify directly the designated organization. If an organization learns of its designation from the Federal Register and wishes to challenge its designation, it has thirty days after publication in the Federal Register to appeal its designation to the United States Court of Appeals for the District of Columbia Circuit. 8 U.S.C. § 1189(b)(1). The D.C. Circuit's review is limited only to the administrative record, except that the government may submit, for ex parte and in camera review, the classified information used in making the designation. Under the statute, the designated organization is not permitted to submit any evidence on its behalf to the reviewing court because the court's review of the designation is to be based solely on the administrative record and the classified information the government submits to support its decision.[4] 8 U.S.C. § 1189(b)(2).
 
 
 8
 The consequences of designation under 8 U.S.C. § 1189 are severe and take effect immediately upon the Secretary's publication in the Federal Register of an organization's designation as a foreign terrorist organization. Nat'l Council of Resistance of Iran, 251 F.3d at 196 (discussing "dire" legal consequences flowing from the Secretary's designation of an organization as a foreign terrorist organization). Representatives and members of designated organizations are forbidden from admission into the United States. 8 U.S.C. § 1182(a)(3)(B)(i). The Secretary of the Treasury may freeze all of the designated organization's assets located in the United States. 8 U.S.C. § 1189(a)(2)(C). In addition, except as authorized by the Secretary, financial institutions are independently required to freeze all assets of designated organizations. 18 U.S.C. § 2339B(a)(2).
 
 
 9
 At issue in this case is 18 U.S.C. § 2339B, which makes it a crime punishable for up to life imprisonment if a person provides "material support or resources" to a designated organization:
 
 
 10
 Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.[5]
 
 
 11
 18 U.S.C. § 2339B(a). "Material support" is defined as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b). The statute does not define what any of these terms mean in the context of the proscribed activity. In addition, a defendant in a criminal action under § 2339B is precluded from raising any question concerning the validity of the organization's designation as a foreign terrorist organization during his or her criminal proceedings.[6]
 
 
 The Plaintiffs And The Organizations They Wish To Support
 
 
 12
 The Kurdistan Workers Party, a.k.a., Partiya Karkeran Kurdistan ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE") have engaged in a broad range of activities, from terrorist violence to peaceful political advocacy to humanitarian aid. The plaintiffs in this case, six organizations and two United States citizens, seek to support only the humanitarian and peaceful political pursuits of the PKK and the LTTE. On October 8, 1997, the Secretary designated the PKK and LTTE, along with 28 other organizations, as foreign terrorist organizations. 62 Fed.Reg. 52,650-51 (Oct. 8, 1997).[7] Since that date, plaintiffs have withheld their support for the non-violent humanitarian and political activities of the PKK and LTTE because they fear that they would be investigated and prosecuted criminally under 18 U.S.C. § 2339B.
 
 
 13
 
 The PKK and the plaintiffs that support the PKK
 
 
 
 14
 Established approximately twenty years ago, the PKK is the principal political organization advocating for Kurdish welfare in Turkey. Comprised mostly of Turkish Kurds, the PKK aims to bring about self-determination for the Kurdish people in Southeastern Turkey. From 1984 through 1999, the Turkish Government and PKK have been engaged in conflict over the issue of Kurdish rights and independence. U.S. Dep't of State, Turkey Country Report on Human Rights (Feb. 23, 2001), available at http://www.state.gov /g/ drl/rls/hrrpt/2000 /eur/844.htm [hereinafter State Department Report on Turkey]. Plaintiffs allege that "for more than 70 years, the Turkish government has subjected the Kurds to human rights abuses and discrimination." Humanitarian Law Project I, 9 F.Supp.2d at 1207. According to the State Department, the Turkish government "has long denied the Kurdish population, who are a majority in the southeast, basic cultural and linguistic rights." State Department Report on Turkey. The Turkish government has forcibly evacuated between 380,000 and 1 million Kurdish villagers from their homes. Id. In addition, the Turkish government has subjected Kurdish civilians to torture and failed to solve numerous cases of extrajudicial murders of Kurds. Id. Turkey bans Kurdish language television or radio broadcasts and the use of Kurdish in schools and by political parties, interferes with the distribution of some Kurdish-language publications, and prohibits selected Kurdish music. Id. Under Turkish law, it is a crime to express sympathy for Kurdish self-determination. In addition, Kurds "who publicly or politically assert their Kurdish identity or publicly espouse using Kurdish in the public domain risk public censure, harassment, or prosecution." Id.
 
 
 15
 The PKK has sought to defend Kurdish human rights in Turkey through a variety of methods. The government alleges that the PKK has engaged in "rural-based insurgent activities" and "urban terrorism." The State Department describes their military efforts as a "terrorist insurgency in southeast Turkey, directed against both security forces and civilians." Id. Turkey prohibits membership in the PKK. Turkey also prosecutes those who provide a wide range of legal and medical support to the PKK[8], and engages in a "widespread practice of evacuating villages to prevent their giving aid to the PKK." Id. Turkey declared a state of emergency "in four southeastern provinces that faced substantial PKK terrorist violence." Id. In addition: "Under the state of emergency, th[e] regional governor may exercise certain quasi-martial law powers, including imposing restrictions on the press, removing from the area persons whose activities are deemed detrimental to public order, and ordering village evacuations." Id. The State Department reports, however, that "since 1999 almost all such violent activity by the PKK has ceased, although some armed clashes between the two sides continued to occur." Id.
 
 
 16
 The record shows that to bring global attention to the plight of Kurds in Turkey, the PKK engages in political organizing and advocacy outside of Turkey by sponsoring international political forums, peace conferences, and cultural festivals. The PKK supports Kurds in exile with social services and humanitarian aid and publishes newspapers and pamphlets denouncing Turkish human rights violations. In Turkey, the PKK "has established a quasi-governmental structure in areas of Turkey under its control, and defends the Kurds from alleged human rights abuses." Humanitarian Law I, 9 F.Supp.2d at 1208.
 
 
 17
 It is undisputed that since 1991, plaintiffs Humanitarian Law Project and Ralph Fertig, who serves as president of Humanitarian Law Project (collectively "Humanitarian Law Project"), have advocated on behalf of Kurds living in Turkey and provided support and training to the PKK to protect the Kurds from human rights abuses. Id. The record establishes that Humanitarian Law Project works to promote international compliance with human rights law and the peaceful resolution of armed conflicts through fact-finding missions, writing and publishing reports, and educational efforts. With consultative status to the United Nations as a non-governmental organization, Humanitarian Law Project regularly participates in meetings of the United Nations Commission on Human Rights. Humanitarian Law Project is opposed to the use of terrorism and has worked to secure human rights through non-violent means.
 
 
 18
 Humanitarian Law Project submitted evidence establishing that before AEDPA was enacted it provided extensive support to the PKK. Humanitarian Law Project conducted fact-finding missions in Turkey to investigate the treatment of Kurds. Humanitarian Law Project published reports and articles describing the Turkish government's role in detaining and torturing persons who speak out for equal rights for Kurds, the summary execution of more than 18,000 Kurds, and the destruction of more than 2,400 villages. Each year since 1991, Humanitarian Law Project has sent a delegation to the United Nations Commission on Human Rights to advocate for the political interests of Kurds living in Turkey. Humanitarian Law Project has twice submitted reports to the United Nations Commission on Human Rights documenting Turkish human rights abuses against the Kurds and arguing that the PKK be granted protections of the Geneva Conventions and Protocols. Since 1992, Humanitarian Law Project has petitioned members of Congress to support human rights for the Kurds in Turkey and encouraged negotiations between the PKK and the Turkish government. In addition, Humanitarian Law Project has asked Congress to support the release of four members of the Turkish Parliament elected in 1991 who are serving 15 year sentences because of their membership in the PKK. Humanitarian Law Project has also trained members of the PKK on how to use international human rights law to seek a peaceful resolution to the conflict in Turkey and how to present their human rights claims before the United Nations and the United States Congress.
 
 
 19
 Since the Secretary designated the PKK as a foreign terrorist organization, Humanitarian Law Project has been deterred from assisting Kurds living in Turkey. But for criminal sanctions imposed under 18 U.S.C. § 2339B for providing "material support" to designated organizations, Humanitarian Law Project would continue to support the PKK by soliciting funds in support of the PKK's humanitarian work, by advocating on the PKK's behalf before the United Nations Commission on Human Rights and Congress, by training the PKK in how to engage in political advocacy and use of international law, by writing and distributing educational literature supporting the PKK, and by providing lodging to PKK members in connection with these peaceful activities.
 
 
 20
 
 The LTTE and the plaintiffs that support the LTTE
 
 
 
 21
 The LTTE, established in 1976, seeks to protect the human rights of Tamils in Sri Lanka and achieve self-determination for the Tamil residents of Tamil Eelam, the Northern and Eastern provinces of Sri Lanka. Plaintiffs allege that for decades the Sinhalese, who have governed Sri Lanka since the nation gained its independence from Great Britain in 1948, have subjected the Tamils to human rights abuses and discriminatory treatment. For the past eighteen years, the LTTE has responded to the conflict by working to achieve a separate ethnic Tamil state. U.S. Dep't of State, Sri Lanka Country Report on Human Rights (Feb. 23, 2001), available at http://www.state.gov /g/ drl/rls/hrrpt/2001/sa/8241.htm [hereinafter State Department Report on Sri Lanka]. The conflict between the Sri Lankan government and the LTTE has claimed more than 64,000 lives. Id. The Sri Lankan government has curtailed the rights of Tamils throughout the country and engaged in "serious human rights abuses" and "institutionalized ethnic discrimination against Tamils." Id. Since April 1995, Sri Lankan security forces have extrajudicially abducted or killed several hundred Tamils after they were taken into state custody. Id. The State Department reported that in 2000, the Sri Lankan military and police killed more than one hundred civilians, tortured detainees by electric shock and near-drowning, engaged in large-scale arbitrary arrests and detentions, and raped women while they were in state custody. Id. The Sri Lankan government has also conducted numerous air-bombing raids in Tamil-majority regions, resulting in dozens of civilian deaths. Id. In 1999, the Sri Lankan government prohibited more than 40,000 Tamil voters from crossing army checkpoints from LTTE-controlled territories to vote. Id. According to the State Department Report on Sri Lanka, more than 490,000 persons have been displaced from their homes and villages due to the conflict as of the end of 2000; "[l]andmines, booby traps, and unexploded ordnance pose a problem to resettlement of displaced persons and rebuilding." Id.
 
 
 22
 To further its goals to defend the human rights of Tamils and to struggle for Tamil self-determination, the LTTE has employed both military and non-violent tactics. LTTE forces and the Sri Lankan government have battled over LTTE-controlled areas north and west of Vavuniya. Id. In 1999 and 2000, for example, the LTTE seized strategic points in the Jaffna peninsula. Sri Lanka then "launched a major offensive on the Jaffna Peninsula that resulted in heavy casualties for its forces.... The clashes left large numbers of civilians dead or injured and displaced more than 150,000 persons." Id. The parties are now observing a cease fire. Id.
 
 
 23
 Plaintiffs submitted evidence establishing that the LTTE engages in extensive political organizing, advocacy, and diplomatic activity to defend Tamil human rights and achieve independence in Sri Lanka. In addition, the LTTE provides humanitarian aid and extensive social services to Tamils displaced by the conflict. The LTTE has established a quasi-governmental structure in Tamil Eelam. There, the LTTE provides social services to the Tamil minority by overseeing children's education through the Tamil Eelam Educational Secretariat. The LTTE runs two orphanages in Tamil Eelam. Through the Tamil Eelam Economic Development Organization, the LTTE supports the development of Tamil Eelam's economy. In addition, the LTTE provides the region with a civilian police force.
 
 
 24
 Plaintiffs who wish to aid the LTTE are five organizations and one individual. Collectively, they desire to provide support to the LTTE's humanitarian efforts to promote the human rights and well-being of the Tamils in Sri Lanka. Plaintiffs Ilankai Thamil Sangam, Tamils of Northern California, Federation of Tamil Sangams of North America, and Tamil Welfare and Human Rights Committee, are four organizations comprised primarily of Tamils born in Sri Lanka and ethnic Tamils from all over the world now living in the United States as United States citizens and legal permanent residents. These organizations share the common goal of contributing humanitarian assistance to their Tamil families and communities through the LTTE while promoting knowledge of the Tamil language, culture, and history. Plaintiff Dr. Nagalingam Jeyalingam, a Tamil refugee from Sri Lanka, is a surgeon and a naturalized United States citizen who also wishes to assist the peaceful humanitarian, social, and political efforts of the LTTE. New York-based plaintiff World Tamil Coordinating Committee is a non-membership organization that advocates on behalf of the human rights of Tamils in Sri Lanka. All of the plaintiffs seek only to further the non-violent humanitarian and political activities of the LTTE. The plaintiffs, however, have been deterred from supporting the LTTE because they fear they will be criminally prosecuted under § 2339B.
 
 
 25
 Dr. Jeyalingam and the four Tamil member-based organizations have provided Tamil children orphaned by the conflict with the basic necessities of life by soliciting donations for, and providing money, clothing, baby food, educational materials, and toys to, the LTTE-run orphanages. Plaintiffs have supported Tamil refugees who have been displaced by the conflict by providing cash donations, school supplies, and books to support the LTTE-run Tamil Eelam Educational Secretariat schools. In addition, Dr. Jeyalingam seeks to provide food and clothing to the LTTE-affiliated Tamil Eelam Economic Development Organization, money to the LTTE to pay for its legal fees and costs in challenging the Secretary's decision to designate the LTTE as a foreign terrorist organization, and funding to support the LTTE's work in providing medical assistance to Tamil victims of land mine explosions. Because of the threat of criminal prosecution under § 2339B, plaintiffs have ceased carrying out their efforts described above.
 
 
 26
 Since 1987, the World Tamil Coordinating Committee has distributed literature advocating support for the human rights of Tamils in Sri Lanka. Since Congress enacted AEDPA, many individuals have asked the WTCC to stop sending them literature because they fear that they will be criminally investigated and charged. For the same reason, numerous former donors have stopped making donations to the World Tamil Coordinating Committee.
 
 
 Discussion
 
 
 27
 As stated earlier, this is the second time plaintiffs have challenged the constitutionality of AEDPA sections 302 and 303 before our court. On March 19, 1998, plaintiffs filed an action seeking a nation-wide injunction barring the enforcement of AEDPA sections 302 and 303 against them on the ground that the provisions violated the First and Fifth Amendments. On June 8, 1998, the district court issued a limited injunction barring the enforcement of two terms, "personnel" and "training," included in the statutory definition of "material support." Humanitarian Law Project I, 9 F.Supp.2d at 1215. The district court denied the plaintiffs' remaining claims.
 
 
 28
 Both parties appealed the district court's decision. On March 3, 2000, we affirmed the decision. Humanitarian Law Project II, 205 F.3d at 1130. For a discussion on how we resolved the earlier constitutional challenges to AEDPA, see Humanitarian Law Project II, 205 F.3d at 1133-37.
 
 
 29
 On remand to the district court, the government moved to dismiss and both parties sought summary judgment. The government submitted additional evidence to challenge the district court's preliminary injunction restraining the government's enforcement of two terms found in the definition of "material support," i.e., "personnel" and "training."
 
 
 30
 On October 2, 2001, the district court issued an unpublished final order granting in part and denying in part the cross-motions for summary judgment. The district court issued a permanent injunction restraining the government from enforcing the prohibition on providing "personnel" and "training" to designated organizations. Relying on its previous decision, the district court again denied the plaintiffs' motion for summary judgment seeking to invalidate the statute. This appeal followed. On appeal to this court, plaintiffs voice one additional constitutional claim: that 18 U.S.C. § 2339B is unconstitutional because it cannot be squared with the Fifth Amendment's due process requirement that the government prove personal guilt. Scales v. United States, 367 U.S. 203, 224-28, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).
 
 
 Law of the Case
 
 
 31
 The law of the case "is a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal." Jeffries v. Wood, 114 F.3d 1484, 1488-89 (9th Cir.) (en banc), cert. denied, 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). The law of the case is a discretionary doctrine which "merely expresses the practice of courts generally to refuse to reopen that which has been decided, not a limit to their power." Id. at 1489 (quoting Leslie Salt Co. v. United States, 55 F.3d 1388, 1393 (9th Cir.), cert. denied, 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995)). Law of the case rules are founded upon considerations of consistency and "the sound public policy that litigation must come to an end." Id. (internal quotation marks omitted).
 
 
 32
 We hold that Humanitarian Law Project II is the law of the case on this second appeal with respect to issues of law we previously decided. After our remand to the district court, the plaintiffs presented no evidence in addition to that submitted in their earlier motion for a preliminary injunction to support their later motion for a permanent injunction. Applying the law of the case doctrine, we decline to reconsider plaintiffs' four legal challenges that we considered in full in Humanitarian Law Project II, i.e., (1) that 18 U.S.C. § 2339B violated plaintiffs' First Amendment right to freedom of association because it impermissibly imposed a criminal penalty for their association with the designated organizations; (2) that 18 U.S.C. § 2339B violated plaintiffs' First Amendment right to association by prohibiting them from giving political contributions to the designated organizations; (3) that 18 U.S.C. § 2339B was a content-based restriction on symbolic speech and failed to survive strict scrutiny; and (4) that 8 U.S.C. § 1189 violated plaintiffs' First and Fifth Amendment rights because the scheme gave the Secretary unfettered licensing power to designate an organization as a terrorist organization. We also note that although
 
 
 33
 [r]ulings-predictions-as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily apply as the law of the case.... A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal, however, does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.
 
 
 34
 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.5 (2002).
 
 
 35
 The government, however, argues that it submitted additional evidence challenging the district court's decision to restrain the government's enforcement of two terms found in the definition of "material support," i.e., "personnel" and "training." Thus, in Section II of this opinion we will consider the government's appeal from the district court's ruling that the terms "personnel" and "training" found in the definition of "material support" are void for vagueness under the First and Fifth Amendments. First, however, we will consider plaintiffs' additional constitutional claim raised for the first time in this appeal that 18 U.S.C. § 2339B also violates the Fifth Amendment because that section does not require the government to prove personal guilt. We are mindful that "[i]t is a cardinal principle of statutory interpretation... that when an Act of Congress [such as § 2339B] raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." Zadvydas v. Davis, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (internal citations and quotes omitted). Thus to avoid the serious due process concerns raised by § 2339B, as the following discussion indicates, we construe the statute to require the government to prove that a person acted with knowledge of an organization's designation as a "foreign terrorist organization" or knowledge of the unlawful activities that caused the organization to be so designated.
 
 I.
 
 36
 As stated above, plaintiffs have raised one additional constitutional challenge to 18 U.S.C. § 2339B in their briefs to this court that we did not have before us in Humanitarian Law Project II. That challenge is that § 2339B runs afoul of the Fifth Amendment's right to due process of law because the statute does not require proof that a person charged with violating the statute had a guilty intent when he or she provided "material support" to a designated organization. Because we may, in our discretion, resolve a pure issue of law raised for the first time on appeal to this court when "injustice might otherwise result," Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), we shall address the plaintiffs' Fifth Amendment claim.[9]
 
 A.
 In Scales, the Supreme Court stated that:
 
 37
 In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ... that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause.
 
 
 38
 367 U.S. at 224-225, 81 S.Ct. 1469 (emphasis added).[10] The Supreme Court in Scales announced this requirement of personal guilt 42 years ago in considering the constitutionality of the Smith Act, which prohibited membership in a Communist organization or any other organization advocating the overthrow of the government by force or violence. Congress enacted the Smith Act out of the McCarthy-era belief that the "Communist Party [was] a group bent on overthrowing the Government by force and violence ... and establishing a totalitarian dictatorship in the United States." Id. at 281, 81 S.Ct. 1469 (Brennan, J. dissenting).
 
 
 39
 Scales established the test, stated above, to determine whether holding a person culpable for his or her relationship to an organization is consonant with due process; Scales analyzed the relationship between a person's "status or conduct" with an organization and "the underlying substantive illegal conduct in order to determine whether that relationship is indeed too tenuous to permit its use as the basis of criminal liability." Id. at 226, 81 S.Ct. 1469. The Court recognized that a person who is a merely a member of an organization does not necessarily share in the community of intent of the organization. The Court found, however, that
 
 
 40
 [w]hatever difficulties might be thought to inhere in ascribing a course of criminal conduct to an abstract entity are certainly cured, so far as any particular defendant is concerned, by the requirement of proof that he knew that the organization engages in criminal advocacy, and that it was his purpose to further that criminal advocacy.
 
 
 41
 Id. at 226 n. 18, 81 S.Ct. 1469 (emphasis added). Thus, the Court concluded that the Smith Act satisfied the due process right to "personal guilt" because the Court read the statute to reach only "`active' members having also a guilty knowledge and intent." Id. at 228, 81 S.Ct. 1469. In short, the Court held that the Smith Act survived a due process challenge because the Court interpreted the statute to require proof that an individual member intended to further the unlawful ends of the Communist Party.
 
 
 42
 We have applied the due process right to proof of personal guilt to cases where a person was convicted because of the link of his or her conduct to a proscribed organization. In Hellman v. United States, 298 F.2d 810 (9th Cir.1961), for example, we examined the constitutionality of a conviction under the Smith Act where the defendant had engaged in a variety of activities to support the Communist Party including organizing new members, teaching Communist principles to students and members, and "soliciting contributions for the [Communist] Party." Id. at 813. Applying the Court's decision in Scales, we concluded that the defendant's fundraising and other activities in support of the Communist Party were insufficient to prove that the defendant had the requisite specific intent to pursue the unlawful ends that the statute proscribed, i.e., "to overthrow the Government by force and violence." Id. ("[N]owhere in the evidence ... do we find testimony that Hellman personally advocated violent overthrow of the Government."). To the contrary, we recognized how Hellman's fundraising and teaching activities on behalf of the Communist Party could mean Hellman acted with innocent intent. Id. ("Considering these facts alone, or in conjunction with his knowledge of the Party's illegal advocacy, the activity portrayed is explainable on the basis that he intended to bring about the Party's ultimate goals through peaceable means."). Thus, we concluded that "the evidence was insufficient to support the indispensable finding that, during the period covered by the indictment, Hellman had the specific intent to bring about the violent overthrow of the Government as speedily as circumstances would permit." Id. at 814.
 
 
 43
 In Brown v. United States, 334 F.2d 488 (9th Cir.1964) (en banc), aff'd on other grounds, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), we again applied the due process principle of "personal guilt" when we considered the constitutionality of Section 504 of the Labor Management Reporting Act, 29 U.S.C. § 504, which made it a crime for a member of the Communist Party to hold office in a labor union. The statute did not expressly require proof that the Communist member union officer had the "intent to bring about the evil the statute was designed to prevent or to further other unlawful aims of the Party...." Brown, 334 F.2d at 492. Congress enacted this provision because
 
 
 44
 Congress had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives, including the advocacy of change by democratic methods, but to make them a device by which commerce and industry might be disrupted when the dictates of political policy required such action.
 
 
 45
 Id. at 491 (quoting from American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 678-79, 94 L.Ed. 925 (1950)). To determine whether the statute comported with due process under Scales, we examined whether the relationship between the "the underlying substantive illegal conduct" — the anticipated efforts of a union official to use his or her authority to influence union action to illegally disrupt interstate commerce — and the union official's membership in the Communist Party was substantial enough to assume that the illegal intent of the Party could be imputed to a Communist Party member union official. We defined the "gist of the crime," or "the sole basis of federal concern," to be the threat that a union official might bring about union action that would interfere with commerce. Id. at 496. We concluded that:
 
 
 46
 the relationship between the conduct or status punished and the evil intended here to be prevented is not sufficiently close or substantial to meet the requirements of either the First or Fifth Amendments unless § 504 can be construed as requiring proof either that the defendant has specific intent to use his union office to attempt to disrupt interstate commerce or that he is an active member of the Communist Party with specific intent to promote unlawful party advocacy and action directed toward overthrow of the Government.
 
 
 47
 Id. We ruled that § 504 could not be construed to require proof of specific intent. Thus, we struck down § 504 as unconstitutional.
 
 B.
 
 48
 We are called upon to analyze a statute that presumes that a person acts with guilty intent whenever that person provides material support to a designated organization. In this context, Scales, Hellman, and Brown require us to parse the purpose, intent, and acts of the person and of the designated organization.
 
 
 49
 We believe that serious due process concerns would be raised were we to accept the argument that a person who acts without knowledge of critical information about a designated organization presumably acts consistently with the intent and conduct of that designated organization. The "sole basis of federal concern," Brown, 334 F.2d at 496, of § 2339B is "international terrorism [which] is a serious and deadly problem that threatens the vital interests of the United States." AEDPA § 301(a)(1), Pub.L. No. 104-132 (codified as note to 18 U.S.C. § 2339B). The act or conduct that the statute proscribes is the act or conduct of a person providing "material support" to a designated organization that engages in both humanitarian and unlawful activities. At oral argument, the government told us that it could convict a person under § 2339B if he or she donates support to a designated organization even if he or she does not know the organization is so designated. That is, according to the government, it can convict an individual who gives money to a designated organization that solicits money at their doorstep so long as the organization identifies itself by name. It is no defense, according to the government, that the organization describes to the donor only its humanitarian work to provide basic services to support victims displaced and orphaned by conflict, or to defend the cultural and linguistic rights of ethnic minorities. And, the government further contends, it is no defense that a donor contributes money solely to support the lawful, humanitarian purposes of a designated organization. But we believe that to attribute the intent to commit unlawful acts punishable by life imprisonment to persons who acted with innocent intent — in this context, without critical information about the relevant organization — contravenes the Fifth Amendment's requirement of "personal guilt."
 
 
 50
 In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court struck down on due process grounds an Oklahoma statute that required state employees to take a loyalty oath professing that they were not members of a subversive organization. The Court observed that "[d]uring periods of international stress, the extent of legislation with such objectives accentuates our traditional concern about the relation of government to the individual in a free society." Id. at 188, 73 S.Ct. 215. Recognizing that a state employee can join a proscribed organization "unaware of its activities and persons," the Court concluded that "[i]ndiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power." Id. at 191, 73 S.Ct. 215.
 
 
 51
 Also, in Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), the Court invalidated a law that prohibited Communist party members from obtaining passports as unconstitutional on its face because the "broad and enveloping prohibition indiscriminately excludes plainly relevant considerations such as the individual's knowledge, activity, commitment, and purposes in and places for travel." 378 U.S. at 514, 84 S.Ct. 1659. Congress enacted the provision to thwart a "Communist movement ... whose purpose it is, by treachery, deceit, infiltration ... espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a worldwide Communist organization." Id. at 509 n. 8, 84 S.Ct. 1659 (citation omitted) (alteration in the original). The Court nonetheless held that the statute was unconstitutional on its face because it "sweeps too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment ... and is patently not a regulation narrowly drawn to prevent the supposed evil." Id. at 514, 84 S.Ct. 1659 (citation omitted).
 
 
 52
 While § 2339B implicates these serious due process concerns, we are mindful that "a statute is to be construed where fairly possible so as to avoid substantial constitutional questions." United States v. X-Citement Video, 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Thus, like the courts in Scales and Brown, we look to whether § 2339B can meet the test of due process by interpreting the statute's plain text.
 
 C.
 
 53
 In construing a criminal statute to determine whether Congress intended to require mens rea as an element of an offense, we have long adhered to the principle that "[t]he existence of a mens rea is the rule of, rather than the exception to, principles of Anglo-American criminal jurisprudence." United States v. United States Gypsum Co., 438 U.S. 422, 436, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (quoting Dennis v. United States, 341 U.S. 494, 500, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)). This notion has deep foundations in Anglo-American common law as "indicated by Blackstone's sweeping statement that to constitute any crime there must first be a `vicious will.'" Morissette v. United States, 342 U.S. 246, 251, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In Morissette, the Court explained the importance of the statutory presumption of construing criminal statutes to include a mens rea:
 
 
 54
 The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.
 
 342 U.S. at 250, 72 S.Ct. 240.[11]
 
 55
 Morissette and its progeny teach us that we are to "construe [a criminal] statute in light of the fundamental principle that a person is not criminally responsible unless `an evil-meaning mind' accompanies `an evil-doing hand.'" United States v. Nguyen, 73 F.3d 887, 890 (9th Cir.1995) (quoting Morissette, 342 U.S. at 251, 72 S.Ct. 240). Because criminal offenses requiring no mens rea have a "generally disfavored status," Congressional silence on whether a statute requires mens rea does not "justify dispensing with an intent requirement." United States Gypsum Co., 438 U.S. at 437, 98 S.Ct. 2864; see also X-Citement Video, Inc., 513 U.S. at 70, 115 S.Ct. 464 (discussing "our cases interpreting criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them"); Staples, 511 U.S. at 606, 114 S.Ct. 1793 ("Relying on the strength of the traditional rule, we have stated that offenses that require no mens rea generally are disfavored and have suggested that some indication of congressional intent, express or implied is required to dispense with mens rea as an element of the crime.") (internal citation omitted); Liparota v. United States, 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (holding that "the failure of Congress explicitly and unambiguously to indicate whether mens rea is required does not signal a departure from this background assumption of our criminal law") (emphasis omitted); United States v. Nguyen, 73 F.3d 887, 891 (1995) (noting that "we are reluctant to conclude that Congress intended to dispense with mens rea as an element of a crime absent some indication of congressional intent").
 
 
 56
 The limited exceptions the Court has carved out to the rule of construing criminal statutes to include an element of intent are those "which can be termed `public welfare offenses,' i.e., statutes whose purpose is regulation of `industries, trades, properties or activities that affect public health, safety or welfare.'" United States v. Launder, 743 F.2d 686, 689 (9th Cir.1984) (quoting Morissette, 342 U.S. at 254, 72 S.Ct. 240). With the exception of this narrow class of public welfare offenses, Morissette instructs us that we "should be most reluctant when interpreting statutes to dispense with a mens rea requirement absent a clear legislative intention to do so[.]" Launder, 743 F.2d at 689.
 
 
 57
 It "is a question of statutory construction," Staples, 511 U.S. at 604, 114 S.Ct. 1793, whether 18 U.S.C. § 2339B requires the government to prove that a person who provides "material support" to a designated organization knew of such designation or knew of the unlawful activities that caused it to be so designated. The Supreme Court has "long recognized that determining the mental state required for commission of a federal crime requires `construction of the statute ... and inference of the intent of Congress.'" Id. at 605, 114 S.Ct. 1793 (quoting United States v. Balint, 258 U.S. 250, 253, 42 S.Ct. 301, 66 L.Ed. 604 (1922)) (alteration in the original). Thus, we look first to the language of the statute to determine the intent of Congress mindful that the federal judiciary "should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute." Morissette, 342 U.S. at 263, 72 S.Ct. 240.
 
 
 58
 The language of 18 U.S.C. § 2339B does not in any way suggest that Congress intended to impose strict liability on individuals who donate "material support" to designated organizations. It is significant that Congress used the term "knowingly" to modify "provid[ing] material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B. As the Court observed in Liparota, "Congress certainly intended by use of the word `knowingly' to require some mental state with respect to some element of the crime." Liparota, 471 U.S. at 424, 105 S.Ct. 2084 (emphasis in original). Indeed, the Supreme Court and our circuit have construed Congress' inclusion of the word "knowingly" to require proof of knowledge of the law and an intent to further the proscribed act. In Morissette, for example, the Court "used the background presumption of evil intent to conclude that the term `knowingly' also required that the defendant have knowledge of the facts that made the taking a conversion — i.e., that the property belonged to the United States." X-Citement Video, Inc., 513 U.S. at 70, 115 S.Ct. 464 (citation omitted). The Court in Liparota also read "knowingly" to require the government to prove an accused's guilty intent, or that "the defendant knew his conduct to be unauthorized by statute or regulations." Liparota, 471 U.S. at 425, 105 S.Ct. 2084. Specifically, the Court held that a statute proscribing the knowing possession of food stamps in a manner not authorized by statute required proof that the defendant knew that he or she possessed food stamps unlawfully. The Court reasoned that such a construction of the statute was necessary because "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." Id. at 426, 105 S.Ct. 2084.
 
 
 59
 In X-Citement Video, the Court read 18 U.S.C. § 2252, which prohibits "knowingly" transporting, shipping, receiving, distributing, or reproducing a visual depiction of a minor engaging in sexually explicit conduct, to require that the defendant also know the minor's age. X-Citement Video, 513 U.S. at 78, 115 S.Ct. 464. The Court applied the knowledge requirement to the minor's age even though the "natural grammatical reading [of the statute], adopted by the Ninth Circuit, suggests that the term `knowingly' modifies only the surrounding verbs[.]" Id. at 68, 115 S.Ct. 464. The Court also held that the harsh penalties attached to the statute favored construing the statute to require specific intent. Id. at 72, 115 S.Ct. 464. Finally, the Court concluded that an alternative reading of the statute would criminalize otherwise innocent conduct. Id.[12]
 
 
 60
 Applying these principles, we believe that when Congress included the term "knowingly" in § 2339B, it meant that proof that a defendant knew of the organization's designation as a terrorist organization or proof that a defendant knew of the unlawful activities that caused it to be so designated was required to convict a defendant under the statute. The Court's history of interpreting "knowingly" is significant in light of the Supreme Court's admonishment in Morissette that:
 
 
 61
 where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.
 
 
 62
 Morissette, 342 U.S. at 263, 72 S.Ct. 240; see also Carter v. United States, 530 U.S. 255, 265, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) ("a `cluster of ideas' from the common law should be imported into statutory text only when Congress employs a common-law term.") (emphasis in original). Like the provisions in Staples, Liparota, and X-Citement Video, absent the knowledge requirement described above, § 2339B sweeps in persons who act with an entirely innocent intention thus "criminaliz[ing] a broad range of innocent conduct." Staples, 511 U.S. at 610, 114 S.Ct. 1793. As the government contended at oral argument, a donor to a proscribed organization could be convicted under the statute even if he or she was entirely unaware that the organization was designated as a terrorist organization. Read without a requirement that a defendant knew of the organization's designation or knew of the unlawful activities that caused it to be so designated, the statute could be used to punish moral innocents. Liparota, 471 U.S. at 426, 105 S.Ct. 2084 ("This construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct.").[13]
 
 
 63
 Like X-Citement Video and Staples, the maximum fifteen-year penalty under § 2339B is a severe penalty for punishing someone who acted with an innocent intent. X-Citement, 513 U.S. at 72, 115 S.Ct. 464 (holding that statute's maximum 10-year sentence was sufficiently harsh to weigh in favor of reading intent into the statute), Staples, 511 U.S. at 616, 114 S.Ct. 1793 (same). As the Court stated in Staples, "the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with mens rea." Staples, 511 U.S. at 616, 114 S.Ct. 1793. This idea is also rooted in the idea that "[i]n a system that generally requires a vicious will to establish a crime imposing punishments for offenses that require no mens rea would seem incongruous." Id. at 616-17, 114 S.Ct. 1793 (internal citation and quotation omitted). More troubling is that the statute provides for a maximum life term if "the death of any person results." 18 U.S.C. § 2339B(a). It is difficult to believe that Congress intended to impose a life sentence on a person who did not know that his or her support could go toward unlawful activities.
 
 
 64
 Furthermore, the conduct regulated by § 2339B does not fall into "public welfare" category of conduct that the Court has excepted from a scienter requirement. Bryan v. United States, 524 U.S. 184, 192, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998); see also United States v. Freed, 401 U.S. 601, 607, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (holding that presumption of mens rea did not apply to statute regulating grenades); United States v. International Minerals and Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (corrosive liquids).[14] The Court excepts from the scienter requirement conduct where the "dangerousness [of the conduct] alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with mens rea." Staples, 511 U.S. at 611, 114 S.Ct. 1793. "Typically, courts have recognized public welfare offenses in cases involving statutes that regulate potentially harmful or injurious items." Nguyen, 73 F.3d at 891 n. 1 (emphasis added). Thus, we have explained the Court's more narrow interpretation of "knowingly" in public welfare statutes as grounded in "the fact that, while firearms, corrosive liquids and drugs are dangerous substances that are likely to be regulated, food stamps are a benign article whose prohibited uses may be seemingly permissible." United States v. Baker, 63 F.3d 1478, 1492 (9th Cir.1995). Charitable contributions made to organizations are not "inherently dangerous," as are grenades, firearms and corrosive liquids. Freed, 401 U.S. at 609, 91 S.Ct. 1112 (The firearms act "is a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act"). Finally, "public welfare offenses generally are ones where the penalty is relatively small, [and] where conviction does not gravely besmirch." Nguyen, 73 F.3d at 891 n. 1 (quoting Freed, 401 U.S. at 613, 91 S.Ct. 1112). The penalty created by § 2339B — up to life imprisonment — is "far from minor." Id.
 
 
 65
 The one statement in the Congressional Record that refers to an intent requirement in § 2339B was made by Senator Hatch, who cosponsored AEDPA. In introducing the Senate Conference Report to the Senate, Senator Hatch stated: "[t]his bill also includes provisions making it a crime to knowingly provide material support to the terrorist functions of foreign groups designated by a Presidential finding to be engaged in terrorist activities. I am convinced we have crafted a narrow but effective designation provision which meets these obligations while safeguarding the freedom to associate, which none of us would willingly give up." 142 Cong. Rec. S3354 (daily ed. April 16, 1996) (statement of Sen. Hatch) (emphasis added).
 
 D.
 
 66
 The Supreme Court's long-standing interpretation of the term "knowingly" directs us to read § 2339B to include a mens rea requirement. Section 2339B raises the same two concerns that led the Court to construe "knowingly" in X-Citement Video, Liparota, and Morissette to signal congressional intent to include a mens rea requirement: a danger of sweeping in its ambit moral innocents without such a requirement and a harsh penalty attached to the crime. Without the knowledge requirement described above, a person who simply sends a check to a school or orphanage in Tamil Eelam run by the LTTE could be convicted under the statute, even if that individual is not aware of the LTTE's designation or of any unlawful activities undertaken by the LTTE. Or, according to the government's interpretation of § 2339B, a woman who buys cookies from a bake sale outside of her grocery store to support displaced Kurdish refugees to find new homes could be held liable so long as the bake sale had a sign that said that the sale was sponsored by the PKK, without regard to her knowledge of the PKK's designation or other activities. Furthermore, the legislative history contains no indication that Congress intended to impose strict liability on persons who provide "material support" to designated organizations.
 
 
 67
 In light of the text of § 2339B, the Court's longstanding principles interpreting the word "knowingly" to indicate Congress' intent to include a mens rea requirement, and the due process concern earlier discussed, we read § 2339B to require proof of knowledge, either of an organization's designation or of the unlawful activities that caused it to be so designated. X-Citement Video, 513 U.S. at 72, 115 S.Ct. 464 (The "scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct"). Thus, to sustain a conviction under § 2339B, the government must prove beyond a reasonable doubt that the donor had knowledge that the organization was designated by the Secretary as a foreign terrorist organization or that the donor had knowledge of the organization's unlawful activities that caused it to be so designated.
 
 II.
 
 68
 In Humanitarian Law Project II, we upheld the district court's ruling that two components of the definition of "material support," namely "personnel" and "training," were impermissibly vague under the First and Fifth Amendments. Humanitarian Law Project II, 205 F.3d at 1137-38. Accordingly, we upheld the district court's limited injunction that restrained the government from enforcing § 2339B's prohibition against providing "personnel" or "training" to designated organizations. On remand, the government argued in district court that the prohibition against "personnel" and "training" in § 2339B is no longer unconstitutionally vague because the government has formally defined both terms in the United States Attorneys' Manual. Thus, the government contended, the United States Attorneys' Manual provides constitutionally adequate notice to the public of what activity is prohibited. Plaintiffs argued, and the district court agreed, that the new definition in the United States Attorneys' Manual for "personnel" and "training" still does not save the statute from being impermissibly vague because it does not affect the text or meaning of the statute. We consider the government's claims in light of the new evidence it presented to the district court on remand, and we agree with the district court's decision. Thus, we hold that the terms "personnel" and "training" are void for vagueness under the First and Fifth Amendments because they bring within their ambit constitutionally protected speech and advocacy.
 
 
 69
 As we stated in Humanitarian Law Project II, "[w]hen a criminal law implicates First Amendment concerns, the law must be `sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is being prohibited.'" Id. at 1137 (quoting Foti v. City of Menlo Park, 146 F.3d 629, 638 (9th Cir.1998) (internal quotation marks omitted)). In addition, it is "[a] fundamental requirement of due process... that a statute must clearly delineate the conduct it proscribes." Foti, 146 F.3d at 638 (citation and quotation omitted).[15] When a statute criminalizes activity safeguarded by the First Amendment, we are concerned with "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). We thus review criminal statutes impinging on First Amendment rights with strict scrutiny because:
 
 
 70
 These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.
 
 
 71
 Button, 371 U.S. at 433, 83 S.Ct. 328 (citations omitted); see also Reno v. American Civil Liberties Union, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Thus, while due process does not "require impossible standards of clarity," Kolender v. Lawson, 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks omitted), the requirement for clarity "is enhanced when criminal sanctions are at issue or when the statute abuts upon sensitive areas of basic First Amendment freedoms," Information Providers' Coalition for the Defense of the First Amendment v. FCC, 928 F.2d 866, 874 (9th Cir.1991) (quotation and alteration omitted). See also Foti, 146 F.3d at 638 ("[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required."); Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (when a "law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").
 
 
 72
 In Humanitarian Law Project II, we correctly concluded that the term "personnel" was impermissibly vague because it is open to a highly subjective construction that endangers lawful conduct protected by the First Amendment. As we stated in Humanitarian Law Project II, "[i]t is easy to see how someone could be unsure about what AEDPA prohibits with the use of the term `personnel,' as it blurs the line between protected expression and unprotected conduct." Humanitarian Law Project II, 205 F.3d at 1137. We observed that "[s]omeone who advocates the cause of the PKK could be seen as supplying them with personnel.... But advocacy is pure speech protected by the First Amendment." Id. Indeed, the term "personnel" could be understood to cover some of plaintiffs' activities most safely guarded by the First Amendment. "Personnel," for example, could be understood to bring into its scope Humanitarian Law Project's members' efforts to urge members of Congress to support the release of Kurdish political prisoners in Turkey. Or, providing "personnel" could reasonably be understood to include the WTCC's writing and dissemination of literature educating the American public on Tamils in Sri Lanka and the LTTE-run Tamil independence movement. Because "personnel" could be construed to include unequivocally pure speech and advocacy protected by the First Amendment, we decline to depart from our legal ruling in Humanitarian Law Project II that the term "personnel" is void for vagueness. Id.
 
 
 73
 We also reaffirm our legal conclusion in Humanitarian Law Project II that the term "training" is unconstitutionally vague. Reasonable people could easily assume that the use of the word "training" in § 2339B encompasses First Amendment protected activities. As we observed in Humanitarian Law Project II, "a plaintiff who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group could plausibly decide that such protected expression falls within the scope of the term `training.'" Id. at 1138. Indeed, Humanitarian Law Project's efforts to train PKK members to use humanitarian and international human rights laws to seek a peaceful resolution to the conflict in Turkey could reasonably fall within the scope of "training."
 
 
 74
 The government argues that it has cured the constitutional deficiencies in § 2339B's prohibition of "personnel" and "training" because it developed the definition of the two terms in the United States Attorneys' Manual. The government's argument carries little weight, however, because the proper analysis centers on whether the statute provides citizens with reasonable notice. Grayned, 408 U.S. at 108, 92 S.Ct. 2294. Even if a citizen did come across the United States Attorneys' Manual, he or she would read its disclaimer that it "is not intended to, does not, and may not be relied upon to create any rights, substantive, or procedural, enforceable by any party in any matter civil or criminal." United States Attorneys' Manual § 1-1.100. Moreover, as we underscored in Free Speech Coalition v. Reno, whether a vague statute survives a due process challenge turns on whether an individual has "an understanding ... about what conduct is prohibited." 198 F.3d 1083, 1095 (9th Cir.1999). Because the United States Attorneys' Manual's expanded definition is neither accessible to the public nor clear from the statute, we conclude that the United States Attorneys' Manual definitions do not change our holding. We thus hold that the prohibition of "personnel" and "training" in § 2339B is unconstitutionally vague. The statute defining the components of "material support" is severable. Thus, § 2339B is enforceable, except for the terms "personnel" and "training" included in the definition of "material support."
 
 III.
 
 75
 We conclude that Humanitarian Law Project II is the law of the case with regard to the legal issues this circuit resolved in that case. Furthermore, to avoid due process concerns and under the Court's long-standing principles of statutory construction, we hold that to convict an accused of violating § 2339B, the government must prove beyond a reasonable doubt that the accused knew that the organization was designated as a foreign terrorist organization or that the accused knew of the organization's unlawful activities that caused it to be so designated. Finally, we hold, as did the district court, that the terms "personnel" and "training" included in the definition of "material support" are void for vagueness.
 
 
 76
 AFFIRMED in part; REVERSED in part.
 
 
 
 Notes:
 
 
 [1]
 The term "terrorist activity" is defined in 8 U.S.C. § 1182(a)(3)(B) to include a range of activity, including the unlawful use of, or threat to use, a weapon against any person or property (other than for mere personal monetary gain). The term "national security" is defined to mean "national defense, foreign relations, or economic interests of the United States." 8 U.S.C. § 1189(c)(2)
 
 
 [2]
 The D.C. Circuit has held that several components of the designation process contained in 8 U.S.C. § 1189 are unconstitutional under the Fifth Amendment. InNational Council of Resistance of Iran v. Department of State, the D.C. Circuit held that procedural due process requires the Secretary to "afford to the entities under consideration notice that the designation is impending." 251 F.3d 192, 208 (D.C.Cir.2001). The notification requirements are not absolute; the D.C. Circuit developed an exception that "[u]pon an adequate showing to the court, the Secretary may provide this notice after the designation where earlier notification would impinge upon the security and other foreign policy goals of the United States." Id. The D.C. Circuit also held that due process requires that the Secretary must "afford to entities considered for imminent designation the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." Id. at 209.
 
 
 [3]
 InPeople's Mojahedin Organization of Iran v. Department of State, 327 F.3d 1238, 1243 (D.C.Cir.2003), the D.C. Circuit held that due process does not require the Secretary to disclose to the designated organization the unclassified information it uses in the designation process.
 
 
 [4]
 A group may only cease to be designated as a foreign terrorist organization if: (1) the Secretary fails to renew the designation after two years, 8 U.S.C. § 1189(a)(4)(B); (2) Congress blocks or revokes a designation, 8 U.S.C. § 1189(a)(5); or (3) the Secretary revokes the designation based on a finding that changed circumstances or national security warrants such a revocation, 8 U.S.C. § 1189(a)(6)(A). In addition, the D.C. Circuit may set aside the designation under 8 U.S.C. § 1189(b)(3)
 
 
 [5]
 As amended October 26, 2001. Pub.L. No. 107-56, § 801(d), 115 Stat. 380 (2001). Previously, the maximum penalty was a fine or imprisonment for no more than 10 years, or both
 
 
 [6]
 But see United States v. Rahmani, 209 F.Supp.2d 1045 (C.D.Cal.2002). In Rahmani, the District Court for the Central District of California held that a defendant charged under 18 U.S.C. § 2339B can raise the constitutionality of 8 U.S.C. § 1189(b) as a defense because the Secretary's designation of an organization as a foreign terrorist organization is a predicate to conviction under § 2339B. Id. at 1054. The court held that "Section 1189 violates the defendants' due process rights because defendants, upon a successful Section 2339(B) prosecution, are deprived of their liberty based on an unconstitutional designation they could never challenge." Id. at 1054-55. The court also concluded that 8 U.S.C. § 1189(b)(1) was facially unconstitutional because designated organizations are "precluded from challenging the facts contained in the administrative record or presenting evidence to rebut the proposition that it is a terrorist organization." Id. at 1058.
 
 
 [7]
 The Secretary has consistently renewed his designation of the PKK and the LTTE as "foreign terrorist organizations."See 64 Fed. Reg. 55,112 (Oct. 8, 1999); 66 Fed.Reg. 51,088-90 (Oct. 5, 2001).
 
 
 [8]
 For example, theState Department Report on Turkey details the case of Hasan Dogan, an attorney who defends suspects in Turkey's State Security Court. A Turkish Appeals Court sentenced Dogan to three years and nine months imprisonment on "charges by an informer that he was a member of the PKK or assisted the organization." Id. The State Department Report on Turkey also describes the Turkish government's arrest of three elected local mayors for supporting the PKK. Id.
 
 
 [9]
 See also United States v. Alameda Gateway Ltd., 213 F.3d 1161, 1167 (9th Cir.2000) (noting that "the Supreme Court has recognized that a court of appeals does not abuse its discretion when it raises the validity of a law even when the parties failed to raise the issue in the briefs or before the district court") (citation omitted); In re Professional Investment Properties of America, 955 F.2d 623, 625 (9th Cir.1992) (observing that "an appellate court will not consider arguments not raised before the district court unless ... the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed") (internal citations and quotation omitted).
 In addition, it is significant that the government did not argue in their response briefs to this court that plaintiffs waived their claim that § 2339B violates the Fifth Amendment by not requiring proof of personal guilt. The government has thus waived its claim that plaintiffs waived their Fifth Amendment argument by not raising it first in the District Court. See, e.g., United States v. Layeni, 90 F.3d 514, 522 (D.C.Cir.1996) ("Arguments not raised in the district court are generally deemed waived on appeal absent plain error. The government, however, has waived the waiver argument by not raising it.") (citation omitted).
 
 
 [10]
 InHumanitarian Law Project II, the plaintiffs did not raise — and we did not address — plaintiffs' Fifth Amendment due process challenge to 18 U.S.C. § 2339B. While the Fifth Amendment's right to "personal guilt" is similar to the First Amendment's right to the freedom of association raised by the plaintiffs in Humanitarian Law Project II, the Fifth Amendment claim stands "independently of the claim made under the First Amendment." Scales, 367 U.S. 203, 225, 81 S.Ct. 1469, 6 L.Ed.2d 782. The Fifth Amendment right to "personal guilt" is concerned primarily with criminal penalties imposed on persons who are related by "status or conduct" to a proscribed organization. Id. (emphasis added). The First Amendment right, as we discussed in Humanitarian Law Project II, safeguards people who are punished "by reason of association alone" or for their speech-related advocacy in support of a distinct organization. Humanitarian Law Project II, 205 F.3d at 1133-34.
 
 
 [11]
 InMorissette, the Court held that to convict the defendant of "knowing" conversion of federal property, property that defendant believed had been abandoned, the government had to prove an "evil state of mind." Morissette, 342 U.S. at 264, 72 S.Ct. 240. Although Morissette reinforced the notion that criminal intent "generally remains an indispensable element of a criminal offense[,]" United States Gypsum Co., 438 U.S. at 437, 98 S.Ct. 2864, in common law crimes, the Court has since made clear that this principle applies with equal force to criminal statutes that were not imported from common law. Staples v. United States, 511 U.S. 600, 605-06, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) ("There can be no doubt that this established concept [of presuming a mens rea requirement in criminal statutes] has influenced our interpretation of criminal statutes. Indeed, we have noted that the common-law rule requiring mens rea has been followed in regard to statutory crimes where the statutory definition did not in terms include it.") (internal citation and quotation omitted).
 
 
 [12]
 InStaples, the Court imposed a mens rea requirement to a statute that made it a crime to possess a firearm without proper registration even though the statute did not contain the term "knowingly." The Court held that to impose liability on a defendant for unlawful firearm possession under the challenged statute, the government must prove that the defendant knew that his or her weapon possessed the proscribed automatic firing capability. The Court rejected the argument that the offense should be construed as a public welfare offense. In doing so, the Court emphasized that the "Government ignores the particular care we have taken to avoid construing a statute to dispense with mens rea where doing so would `criminalize a broad range of innocent conduct.'" Staples, 511 U.S. at 610, 114 S.Ct. 1793 (quoting Liparota 471 U.S. at 426, 105 S.Ct. 2084). Also, the Court held that "the potentially harsh penalty attached to violation of § 5861(d) — up to 10 years' imprisonment — confirms [its] reading [specific intent into] the Act." Id. at 616, 114 S.Ct. 1793.
 
 
 [13]
 See also Nguyen, 73 F.3d at 893 (reading "knowingly" to require specific intent in a statute that proscribed bringing aliens into the United States other than at a designated port of entry because otherwise it would "expose persons who perform innocent acts to lengthy prison sentences"); United States v. Semenza, 835 F.2d 223, 224 (9th Cir.1987) (defendant could not be convicted of allowing unauthorized livestock to trespass on National Forest Land unless the government proved that the defendant acted willfully); Launder, 743 F.2d at 690 (defendant could not be convicted of permitting a fire to burn beyond control unless the government proved a willingness on defendant's part to allow such a result).
 
 
 [14]
 The Court developed the exception for public welfare offenses from the statutory presumption ofmens rea because of the hazards arising out of the Industrial Revolution, which created "dangers [that] have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." Morissette, 342 U.S. at 254, 72 S.Ct. 240. The Court described these dangers as rooted in:
 The Industrial Revolution [which] multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care.
 Id. at 253, 72 S.Ct. 240.
 
 
 [15]
 The key concern underlying the due process requirement for clarity in criminal statutes is fair notice: "It is impermissible to define a criminal offense so vaguely that an ordinary person is left guessing about what is prohibited and what is not. Notice that does not provide a meaningful understanding of what conduct is prohibited is vague and unenforceable."Free Speech Coalition v. Reno, 198 F.3d 1083, 1095 (9th Cir.1999).
 
 
 
 77
 RAWLINSON, Circuit Judge, dissenting.
 
 
 78
 I respectfully dissent from that portion of the majority opinion holding that 18 U.S.C. § 2339B violates Plaintiffs' due process rights under the Constitution.
 
 
 79
 As a preliminary matter, I would not exercise our available discretion to reach the due process issue. The majority opinion notes that the Plaintiffs raised the due process issue "for the first time on appeal to this court." (Maj. Opinion at 394). Nevertheless, the majority elected to exercise its discretion to resolve the newly-raised due process issue, ostensibly to prevent injustice. (Maj. Op. at 394).
 
 
 80
 The majority opinion relies primarily upon the case of Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) to justify the exercise of discretion to address this previously unmentioned claim. The majority opinion implies that "injustice might otherwise result" if the Plaintiffs' newly-minted due process claim went unresolved on appeal. (Maj. Op. at 394). However, it is interesting to note that in Wulff, the Supreme Court expressly ruled that the case under consideration was not one "where injustice might otherwise result" if the newly raised issue went unresolved on appeal. 428 U.S. at 121, 96 S.Ct. 2868.
 
 
 81
 In Wulff, the Supreme Court identified the case of Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), as an example of a circumstance "where injustice might otherwise result" absent resolution of a previously unraised issue. Id.
 
 
 82
 In Hormel, the Supreme Court determined that "injustice might otherwise result" because, absent resolution of the previously unraised issue, the taxpayer would "escape payment of a tax which under the record before us he clearly owes." 312 U.S. at 560, 61 S.Ct. 719.
 
 
 83
 No such eventuality looms over the parties in this case. There is no assertion that any party will escape prospective culpability or lose prospective enforcement capability.
 
 
 84
 No extraordinary issues of injustice exist in this case. Accordingly, I would not exercise discretion to review the previously unraised issue of whether or not 18 U.S.C. § 2339B violates Plaintiffs' due process rights under the Fifth Amendment to the United States Constitution. Nevertheless, in recognition of the majority's disagreement with that view, I proceed to a discussion of the merits of Plaintiffs' due process claims.
 
 
 85
 No one disputes that the PKK and the LTTE are terrorist organizations. The record in this case reflects that the PKK's terrorist activities have resulted in the deaths of over 22,000 individuals, primarily from bombings. The LTTE has a similar history, engaging in bombings, gun battles, assassinations, and machete attacks, causing widespread death and destruction. Despite these organizations' conceded histories of extreme violence, Plaintiffs assert that § 2339B deprives them of their due process rights to contribute to the nonviolent activities of the PKK and the LTTE.
 
 
 86
 It is important to note that § 2339B prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization." Nonetheless, the majority rules that the Plaintiffs' due process rights are violated absent a narrowing interpretation that incorporates a showing of "personal guilt" on the part of the donor. (Maj. Op. at 402-03).
 
 
 87
 The majority opinion cites five cases to bolster its "personal guilt" theory:
 
 
 88
 1) Scales v. United States, 367 U.S. 203, 224-28, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961);
 
 
 89
 2) Hellman v. United States, 298 F.2d 810, 813-14 (9th Cir.1961);
 
 
 90
 3) Brown v. United States, 334 F.2d 488, 491-492, 496 (9th Cir.1964);
 
 
 91
 4) Wieman v. Updegraff, 344 U.S. 183, 188, 191, 73 S.Ct. 215, 97 L.Ed. 216 (1952); and
 
 
 92
 5) Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).
 
 
 93
 Regrettably, I cannot agree that these cases support application of the "personal guilt" theory to the facts of this case, because none of the cases relied upon by the majority are analogous.
 
 
 94
 Scales involved the Smith Act, which prohibited, among other things, membership in a group that advocated overthrowing the United States government. 367 U.S. at 206 n. 1, 81 S.Ct. 1469. In rejecting Mr. Scales' due process challenge, the Supreme Court ruled that no conviction could rest on mere membership "unaccompanied by any significant action in its support..." Id. at 228, 81 S.Ct. 1469. We have exactly the opposite circumstance in this case — no evidence of membership, but substantial evidence of "significant action in [] support" of terrorist groups. I read Scales as undergirding, rather than undermining, § 2339B's provisions.
 
 
 95
 In Hellman, we also addressed the Smith Act, and followed the Scales ruling that active membership in an organization, without a showing of nefarious intent to accomplish the illicit ends of the organization, cannot support a criminal conviction. 298 F.2d at 812-14. As with the Scales case, I cannot say that the court in Hellman would have reached the same result if it were dealing with a statute such as § 2339B, which prohibits not membership in, but material support of, the designated organization.
 
 
 96
 In Brown, we discussed the portion of the Labor-Management Reporting and Disclosure Act that barred members of the Communist Party from holding any office within a labor organization. 334 F.2d at 490 n. 1. In Brown, we recognized that Scales involved the interpretation of "a statute which attributed to an individual member of an organization, seemingly on the basis of membership alone, criminal conduct in which the organization was found to be engaged." Id. at 496. In Brown, we acknowledged that the statute under review imposed "criminal punishment on the basis of union officership combined with Communist Party membership per se." Id. The Brown case continues the "personal guilt" theme, without extending it as far as the majority opinion does-to those who provide material support to acknowledged anarchists.
 
 
 97
 In Wieman, the Supreme Court reviewed an Oklahoma statute prescribing a loyalty oath required of all state employees. The loyalty oath required a disavowal of membership in any group that advocates the overthrow of the United States by violent means. 344 U.S. at 186 n. 1, 73 S.Ct. 215. The Supreme Court noted that the loyalty oath violated due process because "under the Oklahoma Act, the fact of association alone determines disloyalty and disqualification." Id. at 191. As with the other cases relied upon by the majority, the Supreme Court based its finding of unconstitutionality on the pivotal factor that the Oklahoma law punished pure association, rather than actively providing material support to an illicit organization.
 
 
 98
 Finally, Aptheker involved the constitutionality of the Subversive Activities Control Act of 1950, which prohibited any member of a Communist organization from acquiring or using a passport. 378 U.S. at 501-02, 84 S.Ct. 1659. In finding a due process violation of the right to travel abroad, the Supreme Court emphasized that "[t]he prohibition against travel is supported only by a tenuous relationship between the bare fact of organizational membership and the activity Congress sought to proscribe." Id. at 514, 84 S.Ct. 1659 (emphasis added). As with the other "membership" cases, the sole basis upon which the statute was invalidated was its criminalization of membership status alone.
 
 
 99
 None of these five cases, fairly read, support the majority's holding that a narrowing interpretation is required to salvage § 2339B. Simply stated, the Plaintiffs sought and secured a ruling that so long as they profess an intent to further only the legitimate goals of the terrorist organizations, their material support of these organizations should escape scrutiny or consequence.
 
 
 100
 We rejected the "wide-eyed innocent" preemptive defense in Humanitarian Law Project v. Reno, the prior appeal of this case. 205 F.3d 1130 (9th Cir.2000). After examining § 2339B in light of an asserted First Amendment violation, we held that "[m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent. Once the support is given, the donor has no control over how it is used. We therefore do not agree with ADC II's implied holding that the First Amendment requires the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds." Id. at 1134.
 
 
 101
 Although made in the context of a First Amendment challenge to § 2339B, our rationale also resonates in the face of a Fifth Amendment due process challenge. The cases relied upon by the majority engrafted a mens rea requirement upon statutes that prohibited mere membership in an illicit organization. In addition, the subversive activities attributed to the organizations contemplated in the statutes were more theoretical than real. In contrast, § 2339B applies in this case to real-life terrorist organizations that have engaged in all-too-real terrorist sorties resulting in widespread death and destruction. Faced with this reality, I cannot agree that the majority's holding is dictated by precedent. I would AFFIRM the district court's ruling in its entirety.